

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00209-CV

IN THE INTEREST OF A.B. AND
H.B., CHILDREN

----------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## DISSENTING OPINION ON APPELLEES' MOTION FOR REHEARING AND MOTION FOR EN BANC RECONSIDERATION
----------

I respectfully dissent.  This court has already written two opinions reversing two trial court judgments terminating Father's parental rights.  *See In re A.B.*, No. 02-09-00215-CV, 2010 WL 2977709 (Tex. App.—Fort Worth July 29, 2010, no pet.) (mem. op.) (hereinafter referred to as *A.B. 1* and attached hereto as Appendix 1); and *In re A.B.*, No. 02-11-00209-CV, 2012 WL 4010404 (Tex. App.—Fort Worth Sept. 13, 2012, no pet. h.) (mem. op.) (hereinafter referred to as *A.B. 2* and attached hereto as Appendix 2).  The en banc majority now issues an opinion, *A.B. 3*, reaching the opposite result of this court's first two opinions.

In *A.B. 1*, a panel of this court—joined by the now en banc author of *A.B. 3*—reversed the trial court's judgment terminating Father's rights to his two children, holding that legally sufficient but factually insufficient evidence existed to establish the two grounds for termination that the Texas Department of Family Protective Services (TDFPS) proceeded on at trial, endangering environment under family code section 161.001(1)(D) and endangering conduct under family code section 161.001(1)(E). On remand after *A.B. 1*, the State again sought termination of Father's parental rights under family code sections 161.001(1)(D) and 161.001(1)(E). The case proceeded to trial for a second time, and TDFPS offered into evidence no new facts in support of termination of Father's rights under family code sections 161.001(1)(D) and 161.001(1)(E). A comparison of the evidence offered at the first and second trials is detailed in *A.B. 2*. In *A.B. 2,* after thoroughly comparing the evidence admitted at the first trial and the evidence admitted at the second trial, a panel of this court, with one justice dissenting without opinion, found that no new evidence supporting termination of Father's parental rights based on either family code section 161.001(1)(D) or family code section 161.001(1)(E) grounds was admitted on retrial and again found that the evidence was legally sufficient but factually insufficient to support termination based on family code sections 161.001(1)(D) and 161.001(1)(E). TDFPS and Intervenors, who are Father's children's foster parents, filed a motion for en banc reconsideration, and the en banc majority now, after this court has issued two opinions holding that the evidence was factually insufficient to support

2

termination of Father's rights on family code section 161.001(1)(D) or family code section 161.001(1)(E) grounds, holds that the evidence is factually sufficient to support termination of Father's parental rights to his two children based on family code section 161.001(1)(E).

I dissent from the en banc majority's opinion in *A.B. 3* because it does not apply the proper factual sufficiency standard of review. It fails to review the entire record. The majority opinion analyzes the evidence favorable to TDFPS, but it fails to mention, discuss, or analyze much of the evidence evidence favorable to Father—such as that both Nurse Donna Wright and Dr. Peter Lazarus testified that they would have needed to conduct more tests before making a failure-to-thrive diagnosis for H.B. in May 2007;[1] such as that Mother was the person who took the children to the doctor and fed the children; such as that Father is a small man and was a small child and testified that he thought H.B.'s size was genetically-related; such as that paramedic Chris Conner said that when he saw H.B. on September 29, 2007, she looked a little underweight but not emaciated; such as that Nurse Wright testified that A.B.'s injury to his ear was caused by a slap; and such as Father's testimony that he pleaded guilty to injury to a child—slapping A.B.—only after being in jail for seventy-five days, being unable to post his $20,000 bond, and being told that if he could not post his

---

[1]H.B.'s condition was diagnosed in early October 2007, and the evidence is undisputed that she gained weight and began to thrive after that time. So the evidence must show Father's conduct and knowledge before that time to support termination of his rights on section 161.001(1)(E) grounds.

3

bond he would remain in jail for approximately two years until trial unless he pleaded guilty. The en banc majority fails to mention that Father has no drug or alcohol addiction, has maintained stable housing, has provided proof of steady income, has worked his services to the satisfaction of TDFPS to regain his children at one point, and has continuously pursued a relationship with his children.

Despite the fact that three medical experts testified favorably to Father that they did not know without further testing whether H.B. was suffering from failure to thrive and that H.B. appeared only to be a little underweight but not emaciated, despite limited evidence concerning Father's slap to A.B.'s ear, and despite Father's compliance with his service plan, the en banc majority without mentioning any of this evidence, holds that

> the jury could have reasonably concluded that Father engaged in a conscious course of conduct by consistently failing to adequately feed his children and that he voluntarily engaged in a course of hostile conduct around the children, CPS caseworkers, and other authorities that culminated with A.B.'s injuries (for which he pleaded guilty to criminal charges), further endangering the children's physical and emotional well-being.

Maj. Op. at 25. No evidence exists at all that A.B., as opposed to H.B., was malnourished. No evidence exists of a course of hostile conduct toward the children, and hostility toward "CPS caseworkers and other authorities" is not relevant to any element of termination of parental rights under family code section 161.001(1)(E).

4

A correct factual sufficiency analysis must include the entire record; the court must analyze all of the evidence, both the evidence favorable to Father and the evidence favorable to TDFPS. *See, e.g.*, *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The analysis is then whether, based on the entire record, a factfinder could reasonably form a firm conviction or belief about the truth of the termination grounds alleged by TDFPS; if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed such firm a conviction or belief, then the evidence is factually insufficient. *Id.* A complete factual sufficiency analysis, taking into account the entire record, has been twice performed by this court, and twice this court held the evidence to be factually insufficient to enable a factfinder to form a firm conviction or belief that Father engaged in an endangering course of conduct under family code section 161.001(1)(E). *See A.B. 1* and *A.B. 2*.

Applying the appropriate factual sufficiency standard of review, as this court did in *A.B. 1* and in *A.B. 2*, I would hold that the evidence remains factually insufficient to support termination of Father's parental rights under family code section 161.001(1)(E).[2] Because the Majority does not so hold, I respectfully dissent.

---

[2]Because, based on the analysis set forth in *A.B. 1* and *A.B. 2*, I would hold that the evidence is factually insufficient to support termination under family code section 161.001(1)(D) and section 161.001(1)(E), it is unnecessary to address the sufficiency of the evidence to support the best-interest finding.

SUE WALKER
JUSTICE

DAUPHINOT, J., joins.

DELIVERED: August 8, 2013

# Appendix 1



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-09-00215-CV

IN THE INTEREST OF A.B. AND
H.B, CHILDREN

----------

## FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In four issues, Appellant Father appeals the trial court's order terminating his parental rights to his children, A.B. and H.B.  Father argues that legally and factually insufficient evidence exists to support termination of his parental rights

---

[1]*See* Tex. R. App. P. 47.4.

under Texas Family Code sections 161.001(1)(D) and (E)[2] and to support a finding that termination of his parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (Vernon 2008). Father also contends that the trial court violated his due process rights by denying him access to expert witness fees. Because the evidence is factually insufficient to support termination of Father's parental rights under either (D) or (E), we will reverse the trial court's termination judgment and remand this case for a new trial.

## II. FACTUAL BACKGROUND[3]

### A. Mother and Father's Marriage[4] and Domestic Violence in Missouri

Mother and Father met on a telephone chat line and dated for approximately one year before they married on February 18, 2005. Mother is from Texas, and Father is from Missouri, so they bounced back and forth between the two states for a while.

#### 1. Mother's Testimony[5]

[2]For ease of reading, these subsections are hereinafter referred to simply as "(D)" and "(E)."

[3]We recognize that some of the witnesses' testimony is conflicting and inconsistent. This factual background section of our opinion, however, sets forth the testimony given, even when it is inconsistent or even apparently incorrect.

[4]At the time of the termination trial, although Mother was still married to Father, a divorce action was pending, and Mother was pregnant with her boyfriend's child.

[5]Although Mother's parental rights to A.B. and H.B. were terminated at the same time as Father's, she did not appeal the judgment. We include her testimony as it pertains to the endangering conduct and endangering

2

Mother said that when they lived in Missouri, Father hit her more than once and pushed her. Mother said that the domestic violence consisted of both arguing and physical confrontation and that she probably hit Father while defending herself. Mother never called the police or made a report, she never went to a battered women's shelter, and Father never was arrested for domestic violence in Missouri.

### 2. Father's Testimony

Father said that during his first year of marriage to Mother, the police were never called out to their apartment for loud arguments or fighting because there was no domestic violence. Father also testified that he did not strike Mother but that she struck him.

## B. A.B.'s Birth

### 1. Mother's Testimony

Mother testified that A.B. was born in Missouri in April 2005.

### 2. Father's Testimony

A.B. was born with the umbilical cord around his neck, but he was a healthy baby. Father said that they took A.B. to the doctor regularly and that his only hospital visit was the one at the center of this case, which is discussed below.

---

environment findings that the trial court made when it terminated Father's parental rights to A.B. and H.B.; however, we omit testimony regarding Mother's compliance with her service plan and do not attempt to analyze whether the termination of her parental rights was proper because that issue is not before us.

3

### C. Missouri CPS Investigation

#### 1. Mother's Testimony

While Mother and Father lived in Missouri, CPS investigated them because A.B. had cradle cap and a rash and because their house was dirty. Mother felt that the allegations were false. She said that Father called CPS quite often because he wanted them to close the case and that he was harassing the caseworker with an inappropriate tone of voice. Mother said that the CPS caseworker made a surprise visit to their home due to Father's phone calls to their office. Mother and Father thereafter moved to Texas.

#### 2. Father's Testimony

CPS became involved with Mother and Father while they lived in Missouri, but Father said that "[CPS] realized that the referrals that were made were false. And so, after a two- to three-day period, they closed out the case. They did not offer any services or remove the child."

### D. The Move to Texas

When Mother and Father moved to Texas, their first apartment was at the Regents Cove Apartments near Westcreek Drive in Fort Worth. Mother worked, and Father worked sometimes; however, they worked different shifts so that they could take care of A.B.

### E. H.B.'s Birth

H.B. was born June 25, 2006, in Fort Worth and weighed six pounds, twelve ounces. Father worked when H.B. was born until Mother could go back to work.

### F. Domestic Violence in Texas

#### 1. Mother's Testimony

After they moved to Texas, Father continued to yell at Mother, and she yelled back. While Mother was pregnant with H.B., Father hit her and pushed her; she would not hit back or push back but would instead go to another room. After Mother gave birth to H.B., she and Father continued to argue off and on.

Mother said that she never instigated the physical altercations. The domestic violence occurred "once every several months" and did not always involve physical violence. Mother said that the children were present but that Father was never physically violent to them.

#### 2. Father's Testimony

Father said that there were no fights or violence prior to his separation from Mother, and the police were never called to their apartment. Father said that they "fussed over [money] a lot" but that it never came to the point where he became violent with Mother. Father said that if they had arguments, they did not have them in front of the children.

### G. Separation

#### 1. Mother's Testimony

5

Mother left Father in approximately July 2007 because he was abusive. When she separated from Father, Mother moved in with her sister and brother-in-law, Jennifer and Gary W., in Mansfield for a month.[6] Mother testified that Jennifer W. did not take care of the children while Mother worked.[7] Instead, Mother took the children to Father's apartment while she worked in Fort Worth at Sprint from 3:00 p.m. to midnight because Father was not employed; he received Social Security disability payments for ADHD.

Mother rented her own apartment in Bedford in August 2007. After Mother moved into her own apartment, Mother and Father watched the children.[8]

### 2. Father's Testimony

H.B. was two years old and A.B. was three when Mother and Father separated. Father said that when Mother received an $800 check from Sprint, she decided to leave him. She went to Mansfield to live with her sister. Father said that Mother's leaving "kind of hurt" but that he could not force her to stay. During

---

[6]Jennifer W. testified that she had noticed bruises on Mother, and Mother initially told her that she had bumped into a wall or had hit herself. After Mother separated from Father, Mother said that Father had hit her and caused the bruises. Mother told Jennifer W. that she had separated from Father because he was being very abusive toward her.

[7]H.B.'s medical records revealed that Mother said that Jennifer W. watched the children while Mother was at work and that Father watched the children "sometimes."

[8]Jennifer W. said that Mother never lived with her; Mother went straight from Father's apartment into her own apartment. Jennifer W. did not provide babysitting services to Mother and Father's children while they were separated; Mother told Jennifer W. that Father watched the children while she worked from 3:00 p.m. to midnight.

6

the entire separation, Father watched the children a couple of hours during the week but not on a consistent basis. Jennifer W. watched the children while Mother worked. Father did not keep the children overnight because he was having maintenance issues with his apartment. Father said that there was a hole in the bathroom ceiling through which bugs were coming in, and the dishwasher was broken.

After Mother had lived with her sister for about a month, she then moved to Bedford. Father said that after Mother moved to Bedford, he saw the children the same amount of time (a couple of hours a week on an inconsistent basis); Jennifer W. continued to keep the children while Mother was at work. Father said that he did not keep the children for a weekend because he did not want them to be in his apartment that long due to the maintenance issues.

### H. Father's Mental Illness

#### 1. Mother's Testimony

Father told Mother that he was bipolar. He was taking Welbutrin before they got married, but then he stopped. Mother noted that Father was very angry and more argumentative when he was not taking his medication. Mother had also reported to the children's doctors that Father had Tourette's Syndrome, insomnia, ADHD, and a history of seizures as an infant.

#### 2. Father's Testimony

Father testified that he was diagnosed with ADHD as a child and spent most of his childhood—from a very early age to adulthood—in CPS custody

7

where he was placed in sixteen or seventeen foster homes. Father admitted having emotional problems the majority of his adult life "because things haven't been going the way I wanted them to go as far as education and stuff." Father said that he might be depressed one day and extremely happy the next day but that it never led "to the level of complete anger."

### I.     No Domestic Violence After the Separation

Mother said that Father's mood when she saw him daily while dropping off the children was the same as when he was not on his medication; he was angry, but he did not strike her. Mother said that no physical violence occurred during the times when she was dropping off the children and picking them up from Father's apartment. Mother trusted Father with the children despite the domestic violence that had occurred prior to the separation because she "did not see anything, as far as the kids." From A.B.'s birth in April 2005 throughout the time that Mother and Father were separated, Father never harmed the children.


### J.     H.B.'s Growth Issues

#### 1.     Mother's Testimony

Mother took the children to Cook's Clinic for well-baby check-ups. Mother said that she and Father took H.B. to the doctor before they separated and that she was the one who took H.B. to the doctor after they separated.

Mother agreed that H.B. was pretty small and was not growing very fast but said that H.B. was eating regularly during that time and did not appear to

8

have any problems health-wise. Mother said that she had talked to the doctors about H.B.'s slow weight gain, and the doctors were under the impression that H.B. took after Father, who had taken growth hormone shots in order to grow. The doctors did not ask Mother to change H.B.'s feedings. Mother said that she did not have a conversation with Jennifer W., or anyone else, about taking H.B. to the doctor for weight issues.[9]

### 2. Father's Testimony

Father did not go to the doctor visit in May 2007 when H.B. was underweight and falling off the growth chart;[10] Mother said that H.B. was fine, so Father did not know that H.B. was underweight. Father said that H.B. was born small, and he just thought that she was having a tough time growing and that it took some children a little longer than others to develop.

Father said that he and Mother were not purposely doing anything that would have kept H.B. from thriving. H.B.'s appetite was fine; she was eating Cheetos, crackers, and pizza. Father said that they were always able to keep

---

[9]Jennifer W. said that Mother and the children had visited her frequently prior to H.B.'s hospitalization, so Jennifer W. had lots of opportunities to see the children. Jennifer W. was very concerned about H.B.'s appearance from July through September 2007 and told Mother that H.B. did not look healthy. Mother told Jennifer W. that she had a doctor's appointment for H.B., but there was never an appointment. It was obvious to Jennifer W. that H.B. was in distress. Jennifer W. told Mother that if she needed help with formula or food that she would help her. Father was there during that time, so he knew Jennifer W. was concerned.

[10]Father said that Mother did not let him go with her to the children's pediatrician appointments often.

the refrigerator, the freezer, and the cabinets stocked, and they always made sure that their children ate.

Father agreed that H.B. was fifteen months old in September 2007 and that she was not walking or crawling; she was trying to "scoot." Father said that H.B. could sit up when she was close enough to sit against the couch, but she could only sit up by herself for a few seconds before falling over.

### K.  H.B.'s Seizure

#### 1.  Mother's Testimony

On September 29, 2007, Mother had been in Mansfield visiting with Jennifer W., and H.B. had been outside most of the day. Mother and the children were at Mother's apartment when H.B. had a seizure. H.B. was conscious during the seizure, but her eyes rolled back in her head, and she twitched. Mother said that the EMS crew saw H.B. having a seizure and that the seizures occurred repeatedly until H.B. was at the hospital. Mother said that Father went to the hospital when H.B. was being treated.

Mother said that as a result of H.B.'s hospital visit, the Texas Department of Family and Protective Services (hereinafter "the Department" or "CPS") became involved. After H.B. was released from the hospital, the children went to live with Jennifer W. for eight or nine months until they were returned to Father.

#### 2.  Paramedic's Testimony

Chris Conner, a paramedic with the Bedford Fire Department, testified that on September 29, 2007, at 9:58 p.m., he responded to a call that a child was

having a seizure. When he arrived at Mother's apartment,[11] he found H.B. to be a little lethargic. Mother told him that H.B. was in her crib when Mother heard some noises; H.B. started gasping for air and shaking her arms. Mother said it looked like H.B. was having a seizure, but she had no history of seizures. Conner could not tell whether H.B. had suffered a seizure, but he immediately asked one of the firemen who came with him to grab H.B. from Mother's arms and to take her out to the ambulance so that they could assess her.

H.B. did not have a seizure in Conner's presence, and her vital signs were all stable. H.B. was acting fine physically, but she was dehydrated and exhibited skin tartar, meaning that her skin felt "real elastic." Conner said that H.B. "looked a little underweight for her size" but was not emaciated, had an abrasion on her forehead that was in a healing stage, and had "a lot of dirt on her," including dirt under her fingernails. Conner saw that there was a lot of scabbing on her bottom and that there was some dried blood in her diaper.

Mother told Conner that the abrasion on H.B.'s head was caused by A.B. throwing a toy at her four days earlier and that H.B. had a diaper rash that she had continued to scratch.

---

[11]Conner said that he noticed that the home was dirty. He said that there were a lot of dirty dishes in the sink, and pots and pans were still sitting on the stove. Conner described Mother's apartment as an unclean environment that was below standards because its only contents were a bottle of Sprite, an air mattress, and a car seat.

11

Conner advised Cook Children's Hospital of the situation and asked if they would call CPS. His largest concern was H.B.'s head injury because it was unknown how severe the abrasion was and because Mother had admitted that she did not take H.B. to the hospital to have it checked. However, Conner believed that Mother's explanation for the injury—that A.B. threw a toy, which hit H.B.'s head—was consistent with the injury.

### 3. Dr. Lazarus's Testimony

Dr. Peter Lazarus, a pediatrician at Cook Children's Hospital, testified that H.B. was treated in the pediatric intensive care unit (PICU) for seizures and was treated in his ward for failure to thrive. The cause of H.B.'s seizures was a chemical imbalance referred to as hypo low sodium. It is not a chronic condition. It would take hours to two or three days for the condition to appear and be a danger. Dr. Lazarus said that he did not think that the condition could be brought on by Mother's giving the child a lot of water after a day of activity in the warm weather. When H.B.'s sodium level normalized, her seizures stopped.

H.B. was diagnosed with "failure to thrive" because her weight when she was admitted to the hospital, was fifteen pounds, and she was fifteen months old at the time. H.B.'s weight put her well below the fifth percentile on the growth chart. When asked if H.B.'s failure-to-thrive condition would have been obvious two months before to relatives who saw the child every day, Dr. Lazarus said that it would have been less obvious to people who saw the child every day than it would have been to someone who had not seen the child for three months. Dr.

12

Lazarus said that the medical records showed that when H.B. was born, she was in the twenty-fifth percentile.[12] Dr. Lazarus noted that H.B. had her nine-month check-up on April 9, 2007, at a neighborhood clinic, and her weight was in the tenth percentile. Dr. Lazarus said that falling from the twenty-fifth percentile at birth to the tenth percentile nine months later is within the realm of normal because some children "are born bigger than their genetic potential." He also said that sometimes it takes a while for children to get into their normal growth channel, so falling one or two channels or growth curves is not unusual. But he said that if the child was seen at twelve months and at fifteen months and growth was starting to fall off, that would be alarming. When asked if he was concerned about H.B.'s health because she was down below the growth chart, Dr. Lazarus said, "Well, it certainly is not optimum growth."

When asked what the triggers are that let a parent know that the child is in danger of not thriving, Dr. Lazarus said that the parents should find out at "wellcare" or routine baby care. He did not know whether the doctors at Cook's Clinic saw the triggers at H.B.'s check-up five or six months before she presented to the hospital. Dr. Lazarus said that if the child was seen at twelve months, the problem should have been addressed.

---

[12]The medical charts that Dr. Lazarus reviewed also noted that H.B. had developmental delays; she did not crawl, pull up, walk, or sit up alone, which would have been normal tasks for a fifteen-month-old child. There was concern about H.B.'s brain growth because her head circumference was small and was falling off the growth curve, but H.B.'s CT scan was normal.

After she was hospitalized, H.B. began thriving. Because all of H.B.'s metabolic screenings were normal, all the medical personnel did at the hospital was properly feed her, which is what caused her to gain weight. From September 29 to October 8, 2007, while she was in the hospital, H.B. gained one pound, eleven ounces, which Dr. Lazarus said was an "extraordinary weight gain in the hospital." During the nine months from the date that H.B. was hospitalized (September 29) until her second birthday (June 25), she went from well below the third percentile in weight to the seventy-fifth percentile, her length went from well below the fifth percentile to the twenty-fifth percentile, and her head circumference went from the third percentile to the fiftieth percentile. Dr. Lazarus said that H.B.'s weight gain was "really substantial" and told him that she was thriving. These improvements ruled out a hereditary cause for H.B.'s failure to gain weight. Dr. Lazarus had a more solid medical opinion at trial than he had while H.B. was in the hospital because he had received the results from her two-year checkup, so he opined that H.B. was inadequately nourished when she presented on September 29, 2007.

### 4. CPS Investigator's Testimony

Stacie Hall, an investigator with CPS who worked in the night response or emergency response unit, testified that she had received a referral on September 30, 2007, stating that H.B. had been brought to the hospital by EMS at 10:00 p.m. on September 29 for seizures. Hall went to the hospital about noon on September 30 to see H.B. and noted that she appeared pale and very small

14

for her age. H.B. had a diaper rash and had an abrasion on the right side of her forehead, which Mother said occurred when A.B. threw a Buzz Lightyear toy at her head.[13] Hall said that the medical personnel told her that H.B. was admitted to the hospital because they had concerns about her weight and the seizures that she was having.

Mother told Hall that on the day H.B. was taken to the emergency room, she had fed H.B. half of a peanut butter and jelly sandwich around 10:00 a.m., along with water and Sprite. Between going to the lake and then to her relatives' house, Mother fed H.B. some crackers. Mother and Jennifer W. left the children in the care of Jennifer W.'s mother-in-law, whom Mother assumed had fed H.B. something while they were gone. Mother told Hall that she and the children had arrived home at around 7:00 p.m.[14] While Mother was getting dinner ready, she heard H.B. make "a really strange noise." Mother looked and saw that H.B. was gasping for air, that she was "drooling really bad," and that her left arm was twitching. Mother contacted her neighbor, and the neighbor told Mother to call EMS.

---

[13]Father called the CPS office on September 30, 2007, and talked to Hall. He also said that H.B.'s injury was caused by A.B.'s throwing a Buzz Lightyear toy at her. Hall said that the injury looked consistent with the explanation that Mother and Father had given.

[14]Hall said that there were some discrepancies about what Mother did throughout the day; Mother said that they were at the lake all day and then said that they were there for only fifteen minutes.

Hall also obtained some additional background on H.B. and her family from Mother. Mother said that H.B. weighed six pounds, twelve ounces when she was born and that H.B.'s last doctor visit was her thirteen-month well check-up.

Mother told Hall that she had been separated from Father for about two months, but Mother did not mention who she had been living with while she was separated. Mother told Hall that during the time that Mother and Father were separated, Father was still involved in the children's lives. Mother said that Jennifer W. and another lady helped watch the children while she worked; Mother never told Hall that Father watched the children while she worked.

Mother initially denied any domestic violence but then said that Father had been physically violent in the last six months of marriage, which is why she had left him. Mother told Hall that they had a CPS referral for neglect when they lived in Missouri.

When Hall interviewed Father, he said that H.B. ate baby food out of a jar and drank whole milk. Father said that every now and then he would give her some light potatoes or "light solvent," but he did not explain what he meant by "light solvent."

Father said that he and Mother had been separated about two or three weeks but denied that there was domestic violence in his relationship with Mother. Father later said that Mother had assaulted him once. When Hall asked Father why Mother would have said that he was hitting her, he told Hall that he

was going to court to file for child support because he kept the children most of the time[15] (i.e., whenever Mother was at work).

Hall said that the case was found "reason to believe for physical neglect" due to the fact that H.B. was underweight for her age, had poor gross motor skills, was developmentally delayed, and had not been seen by a doctor since May; because all of H.B.'s tests came back normal, the Department determined that H.B.'s condition was due to neglect.[16]

### 5. Father's Testimony

Father said that he became aware of the medical crisis with H.B. when Mother called him from the hospital and told him that CPS was involved. Mother told him, "[P]lease, please don't get upset with them." Father asked if he could speak with the social worker, and that was when Hall had her conversation with Father.

Father did not go to the hospital until Monday because he did not have transportation until that time. H.B. was still in the PICU when Father arrived. Father said that H.B. stayed there for three or four days and then was transferred to a room. Father stayed at the hospital continuously while H.B. was there.

---

[15]Father told Hall that he was unemployed and received Social Security Income (SSI), but he did not explain to her why he was receiving SSI.

[16]La'Morra Cornelius, a caseworker for the family, averred in her affidavit that the reasons for the voluntary placement included H.B.'s health and severe developmental delays, as well as the home environment in which she lived.

17

Father said that he had a problem with the formula that the doctor was giving H.B. because it was causing her stomach to become bloated and making it hard for her to have a bowel movement. Father spoke to the nurses, they ultimately changed the formula, and those problems went away. Father also had a problem with the doctor's not informing him what was going on and not asking for Father's permission to treat H.B.

## L.    Voluntary Placement

### 1.    Hall's Testimony

Hall recommended that the children be voluntarily placed with Jennifer W. and that a case be opened with CPS to provide services to Mother and Father. Mother signed an agreement stating that she would let her children stay with her sister. Hall said that the voluntary placement kept the children from going into foster care. A.B. was already staying with Jennifer W.,[17] and H.B. was taken to Jennifer W.'s house after she was discharged from the hospital.

### 2.    Father's Testimony

Father also signed the papers to allow his children to live with Jennifer W.; he thought that if he did not allow his children to stay with her, he would lose his parental rights because that is what the investigator told him. CPS left it up to Jennifer W. to determine when Father could visit, so Father was allowed to see his children only about once a month. Father admitted that he did "enough

---

[17]Hall saw A.B. and noted that he was in good health; he was clean and appeared to be of normal height and weight.

complaining" about not getting to see his children that eventually, three or four months later, the caseworker set up supervised visits at the CPS office instead of at Jennifer W.'s residence. After the visits were moved to the CPS office, Father was allowed to visit with the children on a weekly basis.

### 3. Jennifer W.'s Testimony

Jennifer W. testified that she kept the children from when H.B. was released from the hospital through June 2008. Jennifer W. said that the children gained weight and that Early Childhood Intervention services were offered to the children while they were in her home.

## M. Father Worked Family-Based Safety Services (FBSS)

### 1. Father's Testimony

Father said that he immediately wanted to get started on his service plan and that he "jumped right on it" and "got [his] stuff done" as soon as CPS issued the necessary forms. Father said that it took about two months after the voluntary placement to start the plan. Father said that during the time he was working his FBSS, CPS made an unannounced visit to check on the condition of his apartment, the sleeping arrangements, and the food that he had on hand.

Father took parenting classes with Janice Barker, who was with Volunteers of America (VOA); he completed a psychological consultation with Dr. Parnell; and he underwent a psychiatric evaluation with Dr. Yackulic at John Peter Smith Hospital. Father participated in individual counseling with Norma Bartholomew and was supposed to have ten sessions, but they mutually agreed to stop at the

19

seventh session because there was not a bond between them and because she was siding with CPS. Father said that Judy Gaither was his anger management instructor. Father got along well with Gaither because she took the time to listen and understand the situation that he was in and "basically didn't just throw [him] out the door." After Father completed his list of services, CPS gradually increased the time that he was allowed to spend with his children.

### 2. Barker's Testimony

Barker testified that in January 2008, she received a referral to provide services to Father. Barker went over parenting skills and worked on budgeting and homemaking skills with Father. Additionally, Barker provided transportation to Father once a week so that he could visit with his children at CPS.

Barker said that Father was very hostile toward the services until she explained them; at that point, he worked with the VOA but remained hostile to CPS during the entire time that she worked with him. Barker said that Father talked about his CPS case "quite a bit," but he never talked about going and getting his children to remove them. When the trial court asked Barker if she ever felt anxious while in Father's presence, she said that she had a good working relationship with Father and that she did not feel like he was hostile toward her, only CPS, but she would not have wanted to agitate him, especially while the children were there because she could not have physically removed the children.

The issues that Barker identified in her first visit to Father's apartment were that there was very little food, there were no sheets on the bed, and there were stains on the carpet;[18] other than those issues, the apartment was clean. The only food that Father had in the refrigerator was a small package of lunch meat and bread; the fact that he had no fruits or vegetables was a concern. Father told Barker that he did not have food stamps for the children but had only his own food stamp money. Father was very resistant to getting sheets and food because he did not understand why CPS was pushing the issues since the children were not living with him. Barker explained to Father that he had to put healthy food in his home to show CPS that he could provide food in case the children were placed with him on any given day.

From February to March 2008, Father made progress by putting the sheets that the VOA gave him on the bed and purchasing food. During later visits, Barker saw that the same food was there and had not been touched. But Barker agreed that it was reasonable for Father to keep the food for when the children were returned to him and that it was not unusual that the food was not eaten.

Although Father told Barker that he had never been diagnosed with anything, Barker noted that Father paced around his apartment and talked about how his rights as a father were being "very violated" and that was why he had

---

[18]Barker admitted that it was an older apartment and that the stains on the carpet were something that the landlord would have to take care of. Barker said that Father did not have any pets.

made an appointment at West Texas Legal Services. Father did not understand why the children were not placed with him after the problem occurred with H.B. while she was in Mother's possession because he had been taking care of the children every day. When Barker asked him why the children were not placed with him, Father admitted that his apartment was not as clean as it could have been. Father was relatively appropriate from January through March 2008, except for the agitation, the pacing around, and the nervousness, which usually occurred when he spoke of CPS.

Father appeared willing to learn the parenting materials and participated in the parenting classes. Father did quite well on his final parenting quiz and completed all his parenting classes. When Father had completed his parenting classes, Barker talked with the CPS caseworker and discussed closing the VOA services "so that [Father] would not become too dependent upon [their] transportation to and from the children's visits."

### N. Children Returned to Father

#### 1. Mother's Testimony

Ms. Cornelius, the CPS caseworker, told Mother that CPS was going to allow Father to have the children back in his home because he had completed his services, and the children went to his apartment from Jennifer W.'s home. Mother had some concerns about the children being placed back with Father. She wondered whether he could take care of the children financially and thought that she had "mentioned to someone that is not a good idea," but she did not

22

remember whether she pressed it any further. Mother admitted that she was instructed not to have contact with Father until she completed her services.

### 2. Father's Testimony

Father testified that the children were returned to him on June 10, 2008. Father said that CPS did not have reservations about him or they would not have returned the children to him. While Father had the children, Mother was allowed to see them only at the CPS office with supervision.

Father said that the children's schedule when they were with him included waking up around eight or nine; eating pancakes or biscuits for breakfast; playing in the living room with toys; playing outside on the playground; eating pizza, hamburgers, hot dogs, or bologna sandwiches for lunch; playing and watching television; eating dinner that Father fixed;[19] and giving them a bath before bed.

Father said that both children were in diapers. He had twice attempted to potty train A.B., but A.B. had issues with not wanting to sit on the toilet. Father said that he wanted to slowly progress A.B. into potty training instead of traumatizing him. Father said that there was no argument or forcing the issue.

### O. Mother's Domestic Violence Incident

### 1. Mother's Testimony

---

[19]Father said that his cooking skills were "[n]ot the best in the world" but that he could cook microwave food and some on the stove. When A.B. was three, he was eating "table scraps": green beans, vegetables, and normal food that Mother and Father ate. Father said that they mostly had weaned H.B. from her bottle at one year and that she ate small "table scraps." She was "eating as much table food as she could take in."

23

Mother said that on June 16, 2008, she went over to Father's apartment because he had called her; she did not make a scene, she did not punch Father in the face, and no citation was issued. When Father's attorney produced a citation dated June 16, 2008 for assault by contact, Mother said that was the first time that she had seen the citation and that she had not been told that she had been issued a citation. Mother said that she went to Father's apartment to see the children only once; she denied that there was an incident in which she went to Father's apartment, she was unwilling to leave, and she was escorted to the door by Father.

### 2. Father's Testimony

When Mother came to Father's apartment on June 16, 2008, she knocked on the door and said that she wanted to see the children. Father told her that he could not let her see the children because Ms. Cornelius had said that Mother was required to have supervised visits. Father said that he told Mother, "I'm going to have to ask you to leave 'cause I don't want to lose [the children] again." Father had opened the door slightly, and Mother pushed her way in and went to the bedroom where the children were watching television. Father told Mother that she had to leave, put her arm behind her back, and tried to escort her out of the apartment. On the way out of the bedroom, Mother tried to break out of Father's

24

arm and hit her eye on the door frame;[20] Mother left, went to the apartment manager, and said that Father had attempted to beat her. The police thereafter came to Father's apartment.

Mother came over "one other time"[21] when the children were with Father, and Father told her that she needed to leave. Mother punched Father in the eye and then took off running down the stairs. Father said that this was the assault by contact episode that resulted in a citation being issued to Mother.

### P. Barker's July 1 Visit to Father's Apartment

On July 1, 2008, Barker reopened the file on Father because the VOA had received a new referral that his children had been placed back in his care. Barker said that she had concerns when she learned that the children had been returned to Father because he was very agitated during many of her previous visits and spoke in a very hostile manner about Mother and about CPS. Barker said that Father seemed to have a lot of anger issues, so she was concerned with whether those had been addressed. Barker felt like Father's agitation was "probably at a higher level" than what she considered to be normal for people in his situation.

---

[20]Father said that the children were watching television and could have seen Mother hit her face on the bedroom door, but he could not guarantee that they saw it.

[21]Although Father described the previous event as taking place on June 16, 2008, it appears that the following event is the one that took place on June 16, 2008, because it matches the description in the police citation.

When Barker went to Father's apartment on July 1,[22] she was concerned because Father had very little furniture and very little food.  He had a bed in his bedroom, a toddler bed in the living room, a high chair, and an older television console.  Barker talked with Father about the fact that he needed to get some food, told him about utilizing food banks, and said that she would try to get a food card for him.  The lack of food also concerned Barker because it was almost the Fourth of July, and the stores would be closed for the holiday. During that visit, Barker noted, however, that Father's bed and the toddler bed had sheets on them.

## Q. A.B.'s Injuries

### 1. Barker's Observation

On July 8, Barker went back to visit Father, brought food, and noticed that there was not any new food.  Father and the children appeared to have just awakened when she arrived around 9:00 or 9:30 a.m., and both children had dirty diapers.[23]  Barker pointed out the dirty diapers and told Father to change them; he complied.

---

[22]At that time, Father had moved into the Woodhaven apartment complex in east Fort Worth.

[23]Barker said that the fact that both children had dirty diapers when they awakened would not in and of itself be surprising, but "they were very wet and very full, which tends to make you feel like that they were on for quite sometime."

26

Barker noticed that A.B. had bruises on his face and ear.[24]  Barker asked

A.B. what had happened, and he said that he had fallen.[25]  When Barker asked

how he fell, A.B. looked down at the ground and did not say anything else.

Before Barker could ask Father what had happened, Father said, "[Y]ou heard

him, he said he fell."  Barker asked Father how A.B. had fallen, and he said that

he had no idea how A.B. had received the bruising on his face and ear and

denied that he had struck the child.  Barker told Father that he needed to call his

CPS caseworker and inform her of the fall.  Father seemed very hesitant and told

Barker that CPS was not going to believe him.

Barker found the bruising on A.B. to be "very upsetting."  She stated that

the children had just been placed back with Father, that it was a very stressful

time, and that now there was bruising on A.B.'s face.  Barker said that it looked

like a definite handprint on A.B.'s cheek and that his ear was very black and blue.

Barker assumed that A.B.'s ear had been pinched and said that the bruising on

A.B.'s ear was "definitely not a sleeping print."  If A.B. had fallen, Barker would

have expected him to have had other injuries, not just bruising on his face and

ear.  Barker believed that the children were in a dangerous environment, so she

---

[24] Barker testified that she did not see any bruising on the children during her July 1 visit.

[25] Barker testified that A.B. had limited verbal skills and was saying "maybe three-word sentences."

left to make a call to CPS to report the bruising on A.B.[26]  Barker called both the national CPS hotline and the local CPS office because she thought the local caseworker could get out to the apartment faster than someone from the national office.

Barker testified that Father called her a few times after the July 8 incident, and Barker told him that she had made a referral to CPS.  Barker said that the calls that Father made to her were appropriate for the most part; he wanted to verify that she had relayed to CPS that A.B. had stated that he had fallen.  Barker said that Father continued to call her after that, but she screened her calls and did not answer his calls.  When asked if Father continued to call and harass her over the last year, Barker said, "No.  He did come by the VOA office," but she was not there.  Barker stated that after Father came to the VOA office twice, they started keeping the doors locked because his visits alarmed the ladies in the building.

### 2.    Tammy Brooks's Testimony

Tammy Brooks, who works for CPS, was assigned to investigate the referral that was received on July 8, regarding physical injuries to A.B.  She and Officer Steven Osborne went to Father's home to make sure that the children were safe.

---

[26]Barker testified that this was only the second time in her twelve years with the VOA that she had to report abuse.

28

Brooks knocked on the door, and Father opened it. Father asked why she had come to his home "with those pigs," referring to the police. Father called Brooks a "whore" even though they had never met before.[27] Brooks said that Father seemed annoyed that they were at his home and wanted them to leave.

Brooks told Father that she needed to see the children because a referral had been phoned in, but Father would not let her in. He asked if they had a warrant and said that they needed to leave his property if they did not have one. Brooks explained that they did not need a warrant to see his children, but Father still would not let her in.

When Brian Knox of FBSS arrived, Father let him inside his apartment. Knox came out and reported the condition of the children to Brooks. After that, Brooks told Father that she needed to see the children and take pictures of them because Knox had reported that they had injuries. Father picked up each child, held him/her out the door, and said, "[S]ee they're fine." Brooks told Father that if he did not allow her to see his children so that she could make sure that they were safe, then she would go to court, and there might be a removal.

When Father finally let Brooks inside the apartment, Brooks noted that the apartment was sparsely furnished. She saw a red toddler bed in the bedroom, a

_____

[27]Brooks testified that Father never talked to her in a calm manner while she was at his apartment; he was loud, verbally abusive, constantly aggressive, and constantly on the attack. And although he never struck anyone, she was glad that she had police officers with her. Brooks explained that she was not Father's caseworker and that Father wanted his caseworker, Ms. Cornelius.

mattress box spring on the floor, and dishes in the sink; she did not recall seeing anything that was a danger to the children. When asked whether the children were in a neglected environment, Brooks said that she did not spend that much time in the home and could not get a sense of it.[28] Brooks also said that she could not tell whether Father's apartment was a dangerous environment.

Brooks said that A.B. was wearing some mismatched shorts and a shirt; H.B. had on only a diaper. Brooks said that the whole family had an odor from not bathing. Brooks noted that A.B.'s ear was dark purple and that he had some linear bruises on his face. Brooks said that A.B. was really dirty and that she could not see any other bruises in the short amount of time that Father allowed her in the apartment, but she did observe dark marks under A.B.'s eyes.

Father told Brooks that A.B. had fallen off the toddler bed. Later, Father said that A.B. fell off Father's bed. Then, Father gave a more detailed version; he said that he had been asleep and had awakened when he heard A.B.'s crying, and A.B. told him that he had fallen and that it hurt. Father said that A.B. had marks on his eyes because he was not getting enough sleep and that A.B. had marks on his cheeks because he was rubbing his face on the carpet.

Brooks told Father that A.B. needed to be seen by a doctor to make sure that he did not have additional injuries. Father refused to take A.B. to the hospital, stating that he was "not going to fall for it again" because CPS had

---

[28]Brooks said that she was outside Father's home for about three or four hours and that she was inside for only five or ten minutes.

previously taken his children from him at the hospital. Brooks told Father that if he would not take the children to the hospital, CPS would remove them.

Ultimately, Knox transported the children to Cook Children's Hospital, and Brooks followed him. Brooks said that they had a problem when they first arrived at the hospital and tried to get the children seen by a doctor; Father was very angry and would not give any information to the hospital staff to allow them to register the children. Both children were eventually seen in the emergency room.

After they had been at the hospital for an hour or more, Brooks took pictures of the children and tried to clean H.B. with baby wipes because she had dirt on her. Brooks said that H.B. did not look like she was failing to thrive[29] but that both children stared and looked blank, so Brooks thought that they might be hungry. Brooks and Ms. Cornelius bought food for the children and tried to blow on the food to cool it, but A.B. kept putting it in his mouth and eating it while it was still hot. After the children were fed, they began moving, talking to each other, and hugging each other.

Brooks tried to establish rapport with the children by asking their names and ages, but A.B. was unresponsive. When Brooks pointed to his bruise and asked him what had happened, A.B. blurted out, "I fell," and "[i]t hurt." After A.B. said that he had fallen, Brooks heard A.B. tell Ms. Cornelius about a fight

---

[29]Father had asked Brooks to "check out" the doctors that he saw when he was young so that she would realize that H.B. did not have a failure-to-thrive problem but rather that she had a growth hormone problem just like he had when he was growing up.

31

between Father and Mother. A.B. moved his hand and body and said Father pushed Mother, and he demonstrated how she fell down and how she was pushed. As he was telling the story, A.B.'s voice became loud, like he was acting out the scene that he had witnessed.

Based on information that Brooks received from the emergency room doctor, who did not believe that A.B.'s injuries were accidental, Brooks decided to remove A.B. and H.B. from Father and to place them in foster care. In addition to her concern over A.B.'s injuries, Brooks said that the open FBSS case, the history,[30] and Father's behavior[31] factored into her decision to remove the children.

Corporal Blanchard, who had arrived at the hospital while the group was in the exam room waiting for the doctor to see A.B., escorted Father out of the hospital to try to serve him with papers. Ms. Cornelius attempted to serve Father with the notice of emergency removal, but Father refused to sign it. He also refused to sign a medical release information form and to provide placement

---

[30]When Brooks went to investigate the referral, she did not know that there was a prior CPS case in Missouri; she found that out later in her investigation. Father had mentioned that he was from Missouri, so Brooks called the state and requested that they check to see if Father had any CPS history. Missouri responded to Brooks's inquiry and sent CPS records.

[31]Brooks described Father as "so aggressive and so loud and in your face" and said that several times, "people had to come in and tell him to be quiet or they were going to have him taken out of the hospital." Brooks said that Father quieted down for a little bit, but then he became angry when he found out that the doctors had examined H.B.'s private parts; he said that she had been violated.

information, and he had an altercation with Corporal Blanchard.[32] The doctor ultimately released the children to Brooks, and Ms. Cornelius placed them in a foster home, where Jennifer H. became their foster mother.

After the removal, Brooks received phone calls and e-mails from Father. Brooks said that somehow Father had obtained her State e-mail address and had sent her multiple e-mails per day. At the time of trial, which was almost a year after the removal, Father had continued to e-mail her with the last e-mail dated ten days before the termination trial commenced. Brooks said that Father's e-mails[33] repeatedly stated that Brooks had violated his rights, that she had taken his children, that she had been wrong about his son, and that Father had not injured his child. Father did not ask Brooks to further investigate the case but instead blamed her for taking his children, saying that she had handled the case incorrectly. Brooks said that Father kept repeating the same information "in massive amounts, massive emails" and that he "would call back to back to back to back. He would just keep calling." Brooks did not respond to Father's e-mails because they were not providing new information; it was the same thing that he had said on the phone, and she had already told him over the phone that his case had "moved on." Brooks described Father as "unique"

---

[32]Brooks read from her investigation report that Father "told Corporal Blanchard to suck his dick and he grabbed his crotch and thrust it toward him."

[33]The e-mails were not admitted into evidence; Brooks testified that her e-mails were ultimately deleted because her part of the case was closed.

because he kept calling and e-mailing her, and she had never been contacted by a client before via e-mail.

### 3. Nurse Wright's Testimony

Donna Wright is a pediatric nurse practitioner and a sexual assault nurse examiner at Cook Children's Hospital. She is also on the CARE Team, which is the child advocacy resource and evaluation team that sees children who have been possible victims of physical abuse, sexual abuse, or neglect. She testified that she saw both A.B. and H.B. on July 9, 2008, after they had been referred to the CARE Team.

Nurse Wright said that in the emergency room, A.B. underwent a CAT scan of his brain to check for injuries and had x-rays taken of his entire body due to the bruises that had been found. All of the tests came back within the normal range.

Nurse Wright performed a thorough head-to-toe assessment on A.B. because he was too young to give her a history. She saw multiple soft tissue injuries on A.B. Specifically, she noted that A.B. had purple-red bruising approximately two millimeters on his left eyelid and had petechia—small pinpoint-type bruising—on his left cheek and also on the temporal area right next to his eye. Nurse Wright said that A.B. had red lines of bruising on the left side of his face and purple-red bruising on his left ear. A.B. had a five-millimeter brown bruise on his lower left abdomen, a five-millimeter brown bruise on his right lower

34

buttocks, and some line and configuration abrasions on his upper thigh. Photographs of the bruises on A.B. were admitted into evidence.

Nurse Wright provided her opinion regarding A.B.'s injuries. She testified that all of the injuries to A.B.'s face were of equal severity because of the amount of force that would have been necessary to cause those injuries. She said that the injuries would have been painful to A.B.

With regard to the injuries to A.B.'s ear, Nurse Wright said, "[T]hat is an injury where something has to hit only the ear . . . . [S]omething struck the child in the ear[,] or he only fell on one thing on his ear." Nurse Wright said that A.B.'s ear injuries could have been from pinching, slapping, or twisting and pinching. She agreed that the injury to the ear could have been caused by a parent's grabbing the child by the ear with the thumb inside the ear and the first finger outside the ear and pulling or jerking. Nurse Wright testified that the injury to the ear would have required a significant amount of force and agreed that whatever trauma caused the injury to the outside of A.B.'s ear had sufficient force to bruise through the ear to the back. When the trial court asked whether there would be enough strength in the fingertips to make the bruise inside the ear while the rest of the hand was making the print on the face, Nurse Wright answered that it would require really long fingers to wrap that far around and that it would be difficult to have that much force in the fingertips to cause bruising. The ear had a darker bruise, and Nurse Wright opined that the bruise on the face and the bruise on the ear were approximately the same age based on their color and the fact

35

that they were in the same area of the body. Nurse Wright opined that A.B.'s face and ear injuries could have been caused at the same time, but the bruise near his eye was caused at a different time. She said that all of the injuries to A.B.'s ear and face had the potential to be severe because they were on his head and could cause brain trauma.

Nurse Wright testified that she believed that the injuries on the left side of A.B.'s face,[34] which included the linear configuration, were slap marks. She opined that the slap print was caused by an adult because the length between each of the linear marks was inconsistent with a child's hand, that the person who had slapped A.B. had used his/her right hand, and that the bruise from the alleged hand slap was approximately less than three or four days old. Nurse Wright agreed that there was one slap to A.B.'s face and that was all they had pinned down and that the injury could not have been caused by a carpet burn because there were no abrasions, just bruises.

With regard to the injuries to A.B.'s eye, Nurse Wright said that if someone fell forward on an object or onto the floor, his cheeks or forehead would be injured, not the inside of his eye. To cause injuries inside the eye, a toy or another object would have to go straight into the eye. Nurse Wright did not know what caused the injury to A.B.'s eye socket. She said that there was a possibility that the thumb from the hand that made the slap mark might have reached A.B.'s

---

[34]All of A.B.'s injuries were on the left side of his face, with the exception of one bruise that was fading on his right cheek.

36

eye socket, but it was on a different plane.  Nurse Wright did not dispute that A.B. could have fallen, but she did not believe that A.B.'s injuries occurred from a single fall because the injuries were on two different planes of the head.

She said that the bruise on A.B.'s buttock was of concern because it was in an area protected by a diaper and was a different color than his other bruises, which indicated that it had occurred at a different time than the other bruises. Nurse Wright said that it would take a lot of force to get a bruise in a spot covered by a diaper, but A.B. could have sustained a bruise on his bottom if he was running around without a diaper on.  Nurse Wright could not say that the bruises on A.B.'s abdomen and buttocks happened at the same time; she could only say that they were about the same age and were older than the bruises on A.B.'s face.

Nurse Wright was "extremely concerned" about the bruise on A.B.'s abdomen because it is very difficult for the abdomen to bruise from a fall.  She said that there is always a concern about internal injuries—to the liver and pancreas—when there is a bruise on the abdomen.

Nurse Wright said that common accidental bruises in children usually occur on the front side of their bodies on boney prominences—their knees, hands, or forehead—when they fall.  However, A.B. did not have bruises on his boney prominences when Nurse Wright saw him in July 2008.  The fact that A.B. did not have any bruises on his boney prominences was a red flag, but it was the compilation of where all the bruises were located that resulted in Nurse Wright's

37

diagnosis of "not an accident." Nurse Wright said that if A.B. had told her that he had fallen, that would not have changed the diagnosis that he had non-accidental injuries because all of his injuries were not from a single fall. If A.B. had fallen from a toddler bed, Nurse Wright said that it would have been more likely that he would have had injuries to a boney prominence in addition to the injuries that he had presented with. Nurse Wright said that in her opinion, the linear marks were probably from a slap and that the ear injuries could have been caused by a fall. Nurse Wright said that it would not be inconsistent for A.B. to have said that he had fallen, had hurt his ear, and was slapped; however, she did not think that scenario would explain all the injuries that he had. Nurse Wright said that the probability of A.B.'s injuries being caused by an accident was less than five percent.

Nurse Wright performed the same head-to-toe examination on H.B. H.B. had a pale brown bruise on her left thigh that was approximately three by four centimeters. This bruise was not of concern because there were no other bruises and no other injuries.

Nurse Wright saw in the hospital records that H.B. had been hospitalized nine months before for failure to thrive. Nurse Wright was extremely surprised that H.B. had been previously diagnosed as "failure to thrive" because "she was so chunky, she was playful, active" and because she was in the seventy-fifth percentile for weight, the tenth percentile for length, and the fiftieth percentile for head circumference. Nurse Wright said that if she had been in private practice

38

and had seen a child who had gone from the twenty-fifth percentile to the tenth percentile within about four or five months, she would have been extremely concerned and would have required the family to come back to the office to have the child's length and weight checked periodically to monitor the situation. If the child had come in to a clinic with those falling stats, Nurse Wright said that she would have a significant follow-up appointment and would want to see all past growth to know whether the decrease had occurred gradually or had immediately dropped off. Nurse Wright said that it would be difficult for a child's care giver to know that the child was falling off the growth chart unless he or she had gone for a visit with the child's pediatrician and had been told of the problem.

### 4. Caseworker's Testimony

Father volunteered to Ruth Groomer, who became the family's caseworker in July 2008, an explanation about the cause of A.B.'s bruising: he said that A.B. had fallen. Father told Groomer that he and the children had been walking down the street and that A.B. had fallen on a gate rail.[35] Father told Groomer that he never slapped A.B.

### 5. Father's Testimony

Father testified that on July 7 at about 7:00 p.m., A.B. was walking next to the stroller that H.B. was sitting in when he tripped and fell over a gate at the

---

[35]Dorene Branum, the manager of the apartment complex where Father lived, testified that there was a large gate railing in the front of the apartment complex.

apartment complex and hit his ear and his cheek on the ground. Father said that there was no swelling when he checked A.B. before they went to bed.

They went to sleep about 8:00 or 9:00 p.m., and Father awoke an hour or two later to A.B.'s crying, "My ear. My ear," and he was slapping his hand against the metal headboard of his bed. When Father asked A.B. what had happened, he said, "My ear. My ear. My ear." Father thought that A.B. had been jumping on the bed and had fallen down and had hit his ear on the headboard because he was standing on the carpet slapping the headboard when Father woke up. Father did not see any bruising on A.B. at that time. Father said that it is possible that A.B. sustained his injuries from both the fall over the gate and the incident with the headboard. Father said that he was concerned about A.B.'s injury but that he knew that it was not life-threatening.

Father testified that he and the children were sleeping when Barker arrived the next morning. Barker thought there was dirt on A.B.'s ear and tried to rub it off; she then pointed out the bruising on A.B.'s ear while Father was changing his diaper. Barker asked A.B. what had happened, and he said that he had fallen.[36] Barker did not press A.B. for further details.

Father said that he told Barker the whole story about A.B.'s slapping the headboard with his hand but that she must have left that out of her testimony. Father believed that there was an injury to only one side of A.B.'s ear and that

---

[36]Father said that A.B. was "pretty verbal," but he did not speak in full sentences.

40

Barker's rubbing A.B.'s ear may have caused bruising to the other side of his ear to show up at the hospital. Father said that he never slapped A.B. and never pulled or tugged on his ear.

Around 3:00 p.m. on the same day that Barker had visited Father, Brooks came to Father's apartment, along with the police and others. The children were in the living room, and Brooks was outside the door when Father called her a "whore." Father said that he was very sorry for his actions. Father described his attitude when the police arrived as "iffy." He said that he was not cursing at, screaming at, hollering at, threatening, or assaulting anyone; he was just trying to get his point across that A.B. did not need to go to the hospital because he had simply fallen. Father said that he did not have anything to hide but was scared that CPS was not going to believe anything that he said about where the injury came from. He said that he had finally gotten his children back and felt like his life was where it needed to be, so he was afraid of losing his children again.

Father said that he went to Cook Children's Hospital when Brooks threatened to remove the children if he did not take A.B. to the hospital to be examined. He explained that when he refused to sign forms at the hospital, he did so because he thought that CPS should pay for the visit because they had requested it.

### 6. Mother's Testimony

A.B. told Mother numerous times, "[D]addy tried to break my ear."[37] Mother said that A.B. did not provide additional details after he said that Father had tried to break his ear, but he was persistent in his story. Mother believed A.B. and said that Father engaged in similar behavior with her, but Mother later said that in all her years with Father, A.B.'s statement regarding his ear was the only incident that she is aware of in which her son complained that Father may have injured him.

### R. Father Charged with Injury to a Child

Father talked to a detective on July 9, was charged with injury to a child, and spent seventy-five days in jail from July 16 to September 29, 2008. Father's bond was initially set at $10,000. Father asked for a personal recognizance bond, and "the judge, I guess, got mad, and he doubled my bond at arraignment from 10 grand to 20 grand and was making it impossible for me to bond out."

Father's understanding was that if he did not plead guilty, he would spend two years in jail pending trial. So Father signed a judicial confession that he had injured A.B. and entered a guilty plea because he missed his children and knew that the only way he would have any hope of getting his children back would be to plead guilty and to start working on his service plan.

---

[37]Mother was in the midst of potty training A.B. when she voluntarily placed him with Jennifer W., and Mother had talked to Father about having trouble potty training A.B. However, she never saw Father take A.B. by the ear to the bathroom.

S. **Father's Second Round of Services**[38]

1. **Service Plan Requirements**

As noted above, Groomer became the caseworker on this case in July 2008 while Father was incarcerated in the Tarrant County Jail. Groomer developed a service plan for Father that required him to attend counseling, parenting classes, anger management classes, and a batterers intervention program.[39] Father's service plan also required him to undergo a psychiatric evaluation, a psychological consultation by Dr. Parnell Ryan,[40] and a drug and alcohol assessment.[41]

---

[38]Although the Department did not move for termination of Father's parental rights based on any failure to complete his service plan, *see* Tex. Fam. Code Ann. § 161.001(1)(O), we include a discussion of the services that he worked because it is relevant to the endangering conduct and endangering environment grounds that the Department pleaded in its petition to terminate Father's parental rights.

[39]Groomer determined that Father needed to participate in batterer's intervention based on the previous case file, which included in the investigation that A.B. had told CPS that Father had knocked down Mother, had hit her, and had made her cry. Groomer was not aware that Mother had been charged with domestic violence.

[40]Groomer requested that Father complete another psychological consultation, even though Father had completed one the year before, because Father had attended parenting classes and had completed other services for the Department, which could have made the outcome of the psychological consultation different from the previous one.

[41]Groomer testified that the inclusion of the drug-free education in a service plan does not necessarily indicate that the parent has a drug problem. In this case, Groomer testified that she had no evidence that Father used drugs, though there was evidence of "very erratic behaviors."

After Groomer developed a service plan for Father, she went to visit him at the jail on August 26, 2008; gave him the service plan; and went over it with him. During that meeting, Father called Groomer a "bitch" and told her that he had already done services with FBSS, that he would not participate in services, that he did not need services, that the charges against him were going to be dropped,[42] that he would be getting his children back, and that he would move to Missouri to live with his mother as soon as his children were returned to him. Father said that he would not sign the service plan until he had talked to his attorney.

### 2. Service Plan Delay

#### a. Groomer's Testimony

The trial court held a status hearing on September 30, 2008, at which Groomer reported that Father had been released from jail the previous day but was not in attendance at the hearing and had not contacted Groomer despite the fact that her phone number was on his service plan. Groomer acknowledged that Father had lost two and half months of time on his service plan while he was in jail.[43]

---

[42]Father said that he was appealing his conviction for injury to a child and that it would be overturned.

[43]Groomer said that the services on Father's plan were actually offered back in August 2008.

44

In November, Father said that he had lost his service plan. Groomer said that she provided Father with several copies of his service plan; she mailed two copies to him and hand-delivered one in December when she went over the services with him again. Father continued stating through December 2008 that he would not work his services.

### b.    Father's Testimony

Father said that Groomer's statement that he did not contact her until December was incorrect; Father said that within a week of being released from jail, he had contacted Groomer about getting his services in place. Father testified that he had called Groomer fifteen to twenty times in October 2008 and had left voice mails but received no response. At a hearing in January 2009, Father's attorney demanded that Father's services be initiated and pushed, and CPS moved a little faster after that hearing by scheduling parenting classes and anger management classes.

### 3.    Parenting Classes

Father said that as part of his parenting classes, he learned about nutrition; discipline; holding, comforting, and cuddling the children; playing with the children; showing the children that he cared; watching television with the children; the timing for feeding and bathing children; and dealing with the stress of being a parent. Father said that the parenting classes taught him not to spank his children but to put them in the corner and talk to them to see if they knew why

45

they were in the corner; once they said that they were sorry for what they had done wrong, Father could let them out of the corner.

Father admitted that he initially did not want to take the parenting classes, but he later realized that they were beneficial and said that they helped him a lot. He said that the parenting instructor listened to the parents, gave them a chance to talk, and "was just all around a great lady." He did not have any personality conflicts with her. Father made a good grade on his test and received a certificate of completion.

### 4. Anger Management and Individual Counseling Classes

### a. Burdick's Testimony

Constance Burdick, a clinical social worker with Catholic Charities Diocese of Fort Worth, testified that Father came to her for anger management classes and individual therapy. Father was punctual to all ten anger management sessions. In the first class, Father blurted out, "Are you qualified to write a letter saying I don't have an anger problem and get me out of this class?" Father said that he did not want to be there, that he did not have an anger problem, and that he wanted out of the class. Father thereafter frequently asked Burdick to write letters saying that he did not have an anger problem. During the classes, Father talked about what had happened with A.B., and Burdick told him that he needed to wait until individual counseling to discuss that topic. Father also announced in

46

the anger management class that he had ADHD and bipolar disorder.[44] However, Father was never asked to leave a class, and his behavior in the class was not so inappropriate that he was unable to complete the class.

Burdick stated that Father has impulse control issues—when he wants to talk about something, he does not stop talking about it and will interrupt others when they are talking. Burdick believed that Father needed to be in the anger management classes because he was agitated and intrusive, interrupting other people. Father's affect was angry, and he was very tense. Father's anger stemmed from his feeling that the police, the physician at Cook Children's Hospital, CPS, and the courts all had a vendetta against him. In Burdick's opinion, Father did not have any behavioral changes and was not able to articulate what he had learned in the anger management class.

When Burdick conducted individual counseling with Father, she did not see him use the skills that he had learned in the anger management class. He was angry during most of the individual counseling sessions; he was loud, was focused on what he wanted to talk about (i.e., about what had happened to A.B.),[45] and would not accept redirection. Father was not cooperative during the

---

[44]Father gave Burdick some paperwork showing that he had been diagnosed with a personality disorder.

[45]Father said that he had taken the two children to the store and that on the way back into the apartment complex, A.B. had tripped and fallen over something and had hit the side of his head. Father told her that he had pleaded guilty to injury to A.B. because he was coerced by his attorney and the courts.

individual counseling sessions; his total focus was on getting Burdick to write letters stating that he did not have an anger problem, that he did not harm his child, that he did not need to be in counseling, and that his children should be returned to him. When Burdick told Father that she could not write a letter about an event that she did not witness, Father became agitated and said that he was going to prove that he did not hurt A.B. Burdick took Father at his word that he had not hit A.B.

Father told Burdick that he and Mother did not get along and that there had been domestic violence between them.[46] He described one incident that occurred when he twisted Mother's arm behind her back, and the other happened when Mother injured Father on June 16, 2008.[47] The children were with them when this incident of domestic violence occurred. Father repeatedly asked Burdick to obtain the police reports from the domestic violence incidents, but she did not. Burdick believed that Father should have called 911 instead of trying to remove Mother from the premises. Burdick said that Father never acknowledged that he was an abuser of Mother or A.B.

Father told Burdick that he was actively involved in all the CPS programs and that he was doing everything that CPS wanted him to do, including getting

---

[46]In Burdick's counseling with Mother, Mother said that Father was verbally and physically violent toward her.

[47]Although Burdick testified that Father told her that he received a ticket as a result of the June 16 incident, the record does not bear this out. As set forth above, Mother received a citation for the June 16, 2008 incident.

on medication. Burdick, however, could not say whether Father was taking his medication, only that he repeatedly told her that he wanted to get off his medication. Burdick recommended that Father have a full battery of psychological testing to rule out schizoaffective disorder, but he said that he would not undergo further testing.

Burdick believed that Father's involvement with CPS when he was a child had a bearing on his current frustrations with CPS in trying to get his children back. Burdick agreed that Father was driven to get his children back and said that was not a vice. Burdick felt that Father had anger control problems based on the behavior he exhibited and felt that he had been involved in domestic violence.

Father complained to Catholic Charities that he and Burdick were not able to work together, and ultimately, Burdick was removed from the case.

### b. Father's Testimony

Father said that he initially did not think that he needed the anger management class but that he did learn a lot, such as how to control his temper, how to deal well with others, how to communicate positively, and how to not get aggressive with other people. When Father was asked to explain why he still had a tendency to be confrontational after taking the anger management class, he said, "[T]hey're making me look out to be a little bit more worse than it actually is." He said that he gets agitated every now and then because he is doing everything he can to show CPS that he deserves to have his children returned to

him, but CPS is not willing to give him a chance.  Father complained about CPS's failure to return his phone calls and their unwillingness to sit down and have a discussion with him.  He said that he became agitated when he was told that the plan was family reunification and then it was changed to termination.

Father said that he got along with Burdick for the most part.  He said that there were no major confrontations, just "a little discussion at the beginning."  Father ultimately earned a certificate for completing the anger management class.

However, Father began having problems with Burdick in the individual counseling sessions.  In counseling, Father was confronted about his alleged abuse of A.B., and there was a presumption that he had done "these things."  Father believed that Burdick had already decided that he was a child abuser and a batterer, and he felt like that put up a wall between them and did not give him a chance to bond with the counselor.[48]  So Father asked CPS for another counselor, and they said he had to remain with Burdick.  Ultimately, Ms. Hart with Catholic Charities allowed him to switch.

### 5.    Drug Testing

Father said that he has never touched drugs and has never had a positive drug test.  He explained that one time he walked past some neighbors who were

---

[48]Father said that one thing he could have done better under his service plan was to have better interaction with Burdick in counseling, but he felt like he had gotten everything that he could out of the services.

smoking marijuana and that someone told the apartment manager that he was smoking marijuana; the apartment manager then called Ms. Cornelius, who sent Father to take a drug test. Father passed the drug test and said that was the only allegation of drug use.

### 6. Visitations

#### a. Groomer's Testimony

Father's first visitation with the children after he was released from jail occurred on October 10, 2008. Typically during the visits, Father picked up the children individually and gave them a very short ride on his shoulders—maybe one trip around the room for each child—and then he sat down because he said that he was tired. Father then read a book aloud, but he did not gather his children to him. The foster mom sent lunch for the children, and Father brought them a snack because he did "not always have the money to provide [every]thing for his children." Groomer said that the visits "went okay."

Val Trammel was the case aid who observed most of Father's visits, and Groomer observed all but approximately five. Groomer said that it was extremely rare to have two people observe a parent's visits and agreed that supervised visitation is not the optimum type of visitation, but the judge had ordered two people to observe Father's visits. Additionally, the visits were ordered to take place at the Ben Street location so that there would be a security guard. Groomer believed that condition was "absolutely appropriate" because several times they had needed the guard to intervene.

51

For instance, in April, Father came to a visit while he was very agitated, walked straight toward Groomer, started ranting and raving and shaking his finger in her face, waved his arms, and screamed at her. Father said that Groomer and the program director had lied to him about CPS's plan for reunification.[49] Groomer said that Father stood over her screaming, would not sit down, and would not calm himself even after she and the security guard had requested that he calm down. The children retreated to a corner because they appeared to be afraid of him. Groomer became fearful for the children to be returned to Father and decided that CPS should terminate Father's parental rights. Groomer canceled Father's visitation for that day, and CPS did not give a make-up visit. Groomer testified that in her seven and a half years with CPS, she had never seen anyone as upset as Father was. He was so upset that it made her fearful or anxious.

---

[49]It is difficult to determine when the plan changed from family reunification to termination because Groomer could not recall when she, her supervisor, and the program director made the decision to seek termination of Father's parental rights. Groomer said that on September 30, 2008, at the status hearing, they decided to make the change from family reunification to termination. Later, Groomer read an e-mail that she had sent on January 29, 2009, in which she said that "[t]he current permanency goal is family reunification, but Nora and I have discussed this and we feel it should be changed to alternative family unrelated adoption." At the end of the February 24, 2009 permanency conference, the district supervisor announced that the goal was to work a dual plan—family reunification would be worked side by side with termination. When Groomer was asked whether her decision to terminate happened in April after the incident in the CPS lobby, she said, "Yes, on that date due to his behaviors." However, Groomer also testified that CPS had talked about terminating Father's parental rights prior to the April 30 episode at the Ben Street office.

Groomer testified that the photos that were introduced at trial of Father cuddling with the children at the visits were posed at Father's request. Groomer said that Father prompted the children to smile at him and then took their picture during the visitation. Groomer could not say that all the "happy pictures" were prompted because the children had a wonderful time when they were playing on little cars, but Groomer said that they were not interacting with their Father when they were playing on the little cars.

### b. Father's Testimony

Father said that he usually arrived about a half hour early for his visits and that the children would run up to him and grab his leg and hug him. Father said that he would read to them, play with toys with them, and toss papers like Frisbees to them. Father said that his children hugged and kissed him and would ride on his shoulders. Father said that he changed diapers and fed his children at every visit, though sometimes he fed them food that the foster parents had packed because he is on food stamps. Father said that he did whatever he could to show his children that he loved them and that he wanted them back, including telling them that he was trying his hardest to get them back.

Father asked Groomer if he would be allowed to take the children out to the playground during his visits instead of having them stay in the office. Father asked Groomer throughout the majority of the visits and finally had to go to Groomer's supervisor to get the approval to take his children to the playground. Father was able to take the children outside two or three times until A.B. was

53

bitten by a bug at the foster home, and then CPS refused to allow Father to take the children outside.

Father said that Groomer's description that the children were lifeless and flat during his visits was "not true at all." Father said that the pictures showing his children with smiles on their faces accurately depicted their demeanor during his visits. Father said that his visits went very well and that his children cried and wanted to go home with him.

Father said that the visits when Trammel supervised solo went much better than those when Groomer was also present because Trammel quietly observed. Father said that Groomer wrote on a notepad continuously during the visits that she supervised and would verbalize things during the visit, such as, "[H]e's not kissing them enough." Father had a problem with Groomer's standing over him during his visits, making him feel like he was a criminal and a bad father. Father said that if there was verbal friction between he and Groomer it was started by her and would only last a few seconds because he would "chill out 'cause [he] didn't want [his] kids to see that." Father testified that he attempted but was not successful in establishing a working relationship with Groomer.

### 7. Home Visits

Groomer said that before attempting a home visit on Friday, March 20, 2009, at 4:00 p.m., she called Father's attorney because she wanted to request permission to go into Father's home to see if he had adequate accommodations

54

for his children.  Groomer denied wanting to get incriminating information on Father and said that she did not have a camera with her.

When Groomer went to Father's home to perform the unannounced home visit to check on his environment, she took two caseworkers along with her. Groomer knocked on the door, and Father opened the door a small crack and said that he would have to call his attorney.  Father was very angry when he opened the door, and his hands were shaking extremely hard.  After Father spoke with his attorney, Father said that his attorney had refused to let them come in, and so Father did not let Groomer in that day.  While the door was cracked, Groomer noted an extremely heavy smell of smoke and a kind of a musky smell; she said that Father smokes "some kind of a little cigar."

### 8. Service Plan Compliance

#### a. Groomer's Testimony

Groomer said that Father's services were set up immediately on January 6, 2009, when he agreed to do his services.  Father completed the parenting classes and received a certificate, underwent a psychological consultation as ordered by the trial court, took part in an anger management program and received a certificate, attended counseling, made every visitation with his children, and maintained the same residence throughout the pendency of the case.  Although Groomer had no indication that Father had drug or alcohol issues, she included a drug and alcohol assessment in his plan.  Father did not participate in the drug and alcohol assessment.  Father also did not go for a

55

psychiatric evaluation, even though Groomer had given Father the number for MHMR so that he could undergo the evaluation at no charge. At the time of trial, Groomer had not received any information stating that Father had completed a batterers intervention class, but during the weeks prior to trial, Father told Groomer that he was attending a batterers intervention class or was going to attend. When asked whether she wanted to leave the trial court with the impression that Father was not active in getting all of his services taken care of, Groomer said that it was not an impression; it was a fact. Groomer later agreed that Father took all the services that were offered, but in this case, it was not enough. Groomer did not see any behavioral changes or improvement in Father's "character" after the completion of the programs, and Groomer did not believe that Father had demonstrated any benefit from the services that CPS provided to him. In Groomer's opinion, Father did not make a positive change within a reasonable time period, and he did not have adequate parenting skills to care for his two young children.

### b. Father's Testimony

Father testified that he had completed the parenting class, the psychological consult, the anger management class, the counseling sessions, and had made all his visits except for when he was in jail.

### T. Father's Probation

#### 1. Oldham's Testimony

56

Samuel Oldham, Father's probation officer, testified that he was assigned to work on cases for people with mental illnesses. He met with Father on December 31, 2008, and noted that Father had previously been diagnosed as bipolar and that his diagnosis had been sustained by two separate psychological evaluations performed by Dr. Parnell Ryan.

Father, who was serving a two-year probation, was required to perform 160 hours of community service,[50] to report to his probation officer at least once a month or as directed by the trial court or by Oldham, and to pay a $25 monthly probation fee. Oldham testified that Father's probation had five additional mental health conditions: (1) submit to a psychiatric and/or a psychological evaluation, which Father did; (2) attend and participate fully in counseling or classes as directed by the trial court or Oldham, including Project Safe Neighborhood, which he completed, and a substance abuse evaluation; (3) take all medication as prescribed by the treatment provider;[51] (4) abstain from the use, possession, or consumption of alcoholic beverages and submit to testing for alcohol use, which Father complied with by submitting to four urinalyses that were all negative; and (5) be assigned to a mental health officer, which was completed. There was a

---

[50]Father's hours of community service were initially deferred because of the stressful nature of the CPS proceedings and the effect that they were having on Father.

[51]Father was prescribed ten milligrams of Abilify, a psychotropic medication, on February 12, 2009. Father told Groomer that he was taking three milligrams of Abilify.

supplemental condition that there be no harmful/injurious contact with children and that he have only adult-supervised contact with children.[52]

Early on during Father's probation, he violated the terms by failing to submit to a substance abuse assessment, but that violation was later cleared up as a misunderstanding based on scheduling. Father violated his probation on April 3, 2009, when he failed to report for his scheduled monthly appointment. Father claimed that his appointment was at a different time, but Oldham said that Father had been issued written instructions that contained the correct time. Father was contacted on April 4, and he reported as scheduled later in the month.

On May 6, Father received a citation for failing to take his medication as prescribed. During a home visit, Oldham saw that Father had not been taking his medicine, and Father explained that he had been taking his medicine every other day because he did not like the side effects.[53] Father admitted that he did not consult with a physician prior to altering his medication schedule and has since

---

[52]Father wanted unsupervised visitation with the children, and Oldham told him to have his attorney file a motion for modification. Oldham said that he had no reason to agree to the recommendation for Father to have unsupervised contact with the children based on the behavior that he had observed. Oldham noticed that Father frequently became angry and had what appeared to be mood swings.

[53]Father said that he did not skip any pills. He said that the psychotropic medication causes a hand tick and a "very strong aversion to medication." He did not want to take the medicine, but he took it because he loves his children and wants them back.

reported taking his medicine as prescribed. Oldham, however, admitted that the probation department does not have the resources to test whether Father is taking the medicine or throwing away the pills. After the May 6 citation was issued, Oldham noticed mood swings in Father. On May 21, Father called and spoke to acting supervisor Kelly Pierce and expressed various frustrations to her; he sounded very agitated and angry. Five days later when Father called and asked what would happen to his community service once his CPS case was taken care of, Oldham thought that Father sounded depressed because he was brief in his answers and used a subdued voice.

Oldham made four unannounced visits to Father's home. On the two visits when he went inside,[54] on February 25 and May 6, 2009, Father's apartment was very messy and cluttered. Oldham noted that Father's apartment smelled very strongly of tobacco smoke, that there were a large number of dirty dishes in the kitchen, that the refrigerator did not have much food in it, that the child's bed and the baby bed both appeared to be in very poor repair, that the baby bed did not have a padded bottom so the metal support bar was clearly visible as a hump in the bottom lining, that the bedroom was very messy with clothes on the floor, that the bed did not have a frame and did not have sheets on it, and that a gate was stretched across the entry to the kitchen. Oldham stated that he found Father's

---

[54]Oldham said that he was not denied access the other two times; one time Father was not home, and the other time, Oldham had accompanied the transportation officer who picked up Father and took him to the Department.

apartment in a similar condition the second time that he went in. In his lay opinion, Oldham said that the home environment was not suitable for small children.

Oldham said that Father "acts as someone who does not want to be on probation, and he works very hard at taking care of his case" and can be described as "very proactive." Oldham said that there was a fifty-page printout of all his contacts with Father, and Oldham guessed that approximately seventy-five percent of the contacts were phone calls in which Father had asked about his community service and about whether Oldham had received any communication from CPS. Father talked at length to Oldham about his CPS case, including his fears and his poor relationship with the CPS workers.

Oldham testified that Groomer had contacted him approximately three times a month. The initial contact was made by telephone, but subsequent contacts were required to be made in writing so that the trial court could approve or disapprove of her requests for information. On March 10, 2009, Groomer requested information concerning the condition of Father's home during home visits, Father's attitude and behavior during the home visits, any children observed in the home, the results of the psychiatric evaluation, any medications prescribed to Father, anyone who had been fearful of Father, and Father's feelings about CPS staff. On March 25, 2009, Father signed a release, giving Groomer access to information held by Oldham. Oldham believed that Groomer's questions were appropriate for her safety and the safety of others.

60

On April 9, Groomer called to inform Oldham that a CPS director had sent Father an e-mail telling him that he was to cease calling a doctor who had examined his child earlier in the month for a diaper rash. Groomer said that Father repeatedly called the doctor's office and that the doctor's personnel felt threatened. Groomer said that the doctor had called the police and reported to her that Father would be arrested for trespassing if he came to the doctor's office. Father sent an e-mail to Groomer's supervisor stating, "I'm sorry that you've been misinformed regarding calls to the doctor's office. I have not called their office at any time." Oldham was not able to verify Groomer's concerns.

On May 6, Groomer e-mailed Oldham with news that Father had been confronted over identity theft but that the charge could not be prosecuted because of the manner in which the victim of the identity theft handled the situation.

On May 20, there were e-mails and letters received by Oldham from CPS alleging that Father had contacted the children's foster parents.

Oldham said that if Father finished all of his community servics, maintained his fee payments, and maintained general compliance with his probation conditions, he would be eligible for mandatory early dismissal review in September 2009.[55] If Father finished his community service before then, he could obtain an early hearing through an attorney.

_____

[55]Oldham later reiterated in his testimony that Father was up for a review, not a mandatory release, in September 2009.

Oldham expressed some concerns about Father's mental stability if he did not become more proactive with his psychiatric treatment. Oldham specifically noticed high levels of aggression during Father's phone calls and office visits; most of his aggression was directed toward agencies, but some was directed toward individuals. Father never threatened Oldham, but Father had become agitated with Oldham and had accused him of unethical behavior. Based on Oldham's training, experience, and interaction with Father, Oldham believed that Father could be a physical danger to others.

### 2. Groomer's Testimony

While this case was pending, Groomer asked the trial court for permission to have Father sign a release so that she could talk to his probation officer. Groomer called Father's probation officer five times to find out about drug tests and whether Father was in compliance with his probation terms. Groomer read on the record the unredacted portions of Respondent's Exhibit 13, an e-mail from her to Oldham, in which she had requested information on Father.

Groomer admitted that she had provided information to Oldham, telling him that Father had a girlfriend in Springtown and that he was traveling out of the county to visit her. Groomer agreed that she did not have personal knowledge of any of these purported facts. Groomer also contacted Oldham to tell him that Father had improperly e-mailed the foster parents. Groomer admitted that she had also called Oldham to talk about Father's claiming his children on his income tax return and to inform Oldham that she had been told that Father was involved

in some kind of fraud.  When asked how many times she had called Oldham in an effort to provide information on Father that would result in the revocation of his probation and that would "cause him to go to jail for ten years," Groomer said that she never knew that it could cause Father to go to jail for ten years.

## U.    Children's Lives with Foster Parents

### 1.    The Initial Foster Parents

Jennifer H. testified that A.B. and H.B. were brought to her by CPS near midnight on July 8, 2008, and remained in her home until February 15, 2009. When the children arrived, they had on pajamas, their hair was matted and had not been washed, they were dirty and very much in need of a bath, their fingernails were long and dirty, and they had no additional clothes; it took two baths the next morning to get them clean.  While Jennifer H. was bathing A.B., he told her that "his daddy tried to rip his ear off," and Jennifer H. noted that the inside of A.B.'s ear was black and blue, he had finger-sized bruises on both sides of his cheeks, and one of his eyes was bruised.  Jennifer H. said that A.B. spoke to her very clearly[56] and that she reported his statement to CPS.

Jennifer H. said that H.B.'s language was inappropriate for a two-year-old child.  She would yell at Jennifer H., "[W]ould somebody go get me a damn bottle," and if someone bumped her, she would say, "[G]--damn you."  Jennifer H.

---

[56]Although A.B. was three and a half when he came to Jennifer H.'s house and was not fully verbal, he was able let her know what his needs were and when he was unhappy.

63

said that they told H.B. that her language was inappropriate, and she gradually stopped using profanity.

Jennifer H. observed that the children were very fearful of not being fed, and H.B. grossly overate when she first arrived in their house, while A.B. would hide food and stand in the corner and eat. Additionally, Jennifer H. recollected an incident involving H.B. and International House of Pancakes (IHOP). Around Thanksgiving, the children saw a commercial for pancakes at IHOP, and Jennifer H. told the children that she would take them there. When they arrived at the restaurant, it was packed, so Jennifer H.'s husband made the decision that they would go to another IHOP location. A.B. became hysterical, and Jennifer H. had to physically put him in his car seat. A.B. tried to open the window and get out and was crying uncontrollably. Jennifer H. kept reassuring A.B. that they were just going to another IHOP. When they pulled into the second IHOP, Jennifer H.'s husband assured A.B. that he was going to be able to eat pancakes, and he "kind of calmed down and . . . went in and . . . ate." A.B. ate all of his food and all of Jennifer H.'s food and was very embarrassed by the way he had acted.

Before the children's visits with Father started,[57] Jennifer H. said that the children "were great. They were happy. They played with the other children. They were kids. You know, they ate well; they loved to go shopping; they loved

---

[57]From July 8 through the end of September 2008, Father did not have visits with the children because he was in jail. Father's visits began when he was released from jail.

to look good. You know, we -- -- bought them a lot of nice clothes. And they were -- they were just happy." Jennifer H. said that the children were very comfortable in her home, they slept through the night in twin beds, and they used sippy cups.

After the visits with Father started, Jennifer H. noticed "a real rapid decline in their behavior." Jennifer H. said that the children would come home from the visits "wired," and at other times, they wanted to sleep in the crib or play pen. For instance, after some visits, A.B. went immediately to the play pen or the crib or grabbed a bottle and asked Jennifer H. to fill it up and then asked to be put in the crib. A.B. laid in the crib and watched *SpongeBob* on the television for as long as she would let him. Jennifer H. said that A.B. did not act like that on other days of the week.

A.B. also experienced nightmares and would cry out, "[N]o, daddy, no." Jennifer H. would go in to his room, wake him up, hold him, calm him down, and put him back to bed. A.B.'s nightmares happened on the night of the visit and sometimes the night after the visit and continued for several months. A couple of times during his nightmares, A.B. fell out of his bed until Jennifer H. remedied that by placing body pillows around his bed.

After A.B.'s initial telling of the story about his ear during his first bath at Jennifer H.'s house, every so often, A.B. would repeat his statement. One morning when Jennifer H. and A.B. were waiting for the school bus, A.B. started

to cry and said that his ear hurt.  When Jennifer H. asked if A.B. had fallen or if he had bumped it, A.B. said that his dad had tried to rip it off.

Jennifer H. said that around that time, she and her husband made the decision to "let go" of A.B. and H.B.  Jennifer H. had initially wanted to adopt A.B. and H.B., but Father had started making accusations against her.[58]  Jennifer H. said that her home was investigated three times for sexual abuse and physical abuse.  The first allegation that Father made was in regard to bad diaper rashes on H.B.  During that time, H.B. had the flu and was having a lot of bowel movements, so the diaper rash was hard to control.  The second allegation was that something may have happened sexually to the children. When Father attempted to change A.B.'s diaper[59] at a visit and he resisted, Father made the accusation that A.B.'s reaction proved that Jennifer H. was molesting him.  A CPS caseworker examined A.B. and determined that he was fine.  The third allegation involved a bite.  H.B. was bitten by Jennifer H.'s daughter while H.B. was in her home.  Father wanted a doctor to look at the bite marks on H.B.'s face, but Groomer told Jennifer H. that was not necessary.  Thus, CPS ruled out all of the allegations.

---

[58]Jennifer H. said that the investigators told her that Father made the anonymous referrals.

[59]Jennifer H. said that A.B. had a fear of bathrooms; he would resist when she put him on the toilet, so she just let him wear pull-ups.

## 2. Father's Allegations Against Jennifer H.

Father testified at trial regarding his version of the allegations that he made against Jennifer H. He said that the first referral was for an allegation of sexual abuse based on a visit when he went to change A.B.'s diaper, and A.B. pushed him away; Father said that A.B. had never done that before, and it alarmed Father. Father asked Groomer to look into the sexual abuse allegations.

The next referral involved a purple, golf-ball sized bruise on H.B.'s face below her left eye. Father asked Groomer to have a physician look at it, and Groomer said that she believed the foster parents' story—that their daughter had bitten H.B.—and that there was no need to have a physician look at it.

The third referral was for redness in A.B.'s private area. Father said that he felt like the referrals that he made were made in confidence under state law.

## 3. The Current Foster Parents

Greg, A.B. and H.B.'s current foster parent, testified at trial that the children had been in his home for approximately four months. During the first couple of days that A.B. was in their home, he made the statement, "Daddy tried to break my ear," and another statement, "Daddy tried to pull my ear off."

Greg said that A.B. would "hit a wall emotionally, physically" about mid-afternoon and would become very easily agitated at the smallest thing and would throw a tantrum. Greg said that A.B. would regress and that the episodes would usually involve self-injury or an injury to his wife Julie. A.B. struck Julie, H.B.,

67

and Greg, with the last time that he hit Julie occurring in April 2009. A.B. also attempted to bite Greg's arm, but he stopped himself before he actually bit Greg.

Greg said that the children are now doing very well in his home. A.B. has a lot of superhero toys that he likes, H.B. likes to play with food and cooking-type toys, and both children like to play with blocks. Greg said that they have transitioned the children from *SpongeBob* to more educational shows on television and that seems to have had a positive effect on their developmental skills.

Greg testified that he had concerns about giving his address and the name of his employer because there was a pattern in this case where information reached Father, and then Father used the information to harass Greg or the children's caregivers. Father had contacted the pediatrician that Greg took the children to and had also e-mailed Greg. In the e-mail, Greg received Father's phone number and his Metro account, which Greg used to see if Father had anything posted on the internet. Greg performed a Google search and found websites that Father had set up on the internet. Based on what he found, Greg said that he has concerns about the children's safety if they are returned to Father.

### 4. Father's Allegations Regarding the Current Foster Parents and His Responses to Greg's Testimony

While the children were with Greg, Father noticed during a visit that H.B. had three fingertip contusions above her buttocks. Father asked the investigator to look at the injuries and see if they were accidental or intentional.

Father admitted that he took Greg's e-mail address from the discovery in this suit and responded to his accusations that the children were returned to him after the visits with dirty diapers and diaper rashes; Father said that it was not his fault because Mother's visits followed his. Father said that he did not contact the pediatrician that Greg took the children to.

Father admitted that he had posted family pictures of his children on an internet website that he used for finding friends and dating. Father was not aware of who looked at the websites, but he hoped that it was adults. Father also admitted that he had posted nude photos of himself on a different internet website and that it was not at all appropriate for him to do that. He posted the pictures right after he was released from jail because he "was trying to have a little bit of fun." He said that the children were never exposed to the website because they were in foster care.

### V. Father's Environment

#### 1. Mother's Testimony

Mother said that Father's apartment smelled like dogs[60] and that it was unclean. Mother therefore did not believe that Father's apartment was appropriate for the children. However, Mother said that Father had beds for the children and that she did not have any concerns about the children being taken care of at Father's home.

#### 2. Father's Testimony

Father testified at trial that he was living in a one-bedroom apartment at the Cherry Hill Apartments, where he had lived since June 10, 2008. Father said that his apartment was clean and well kept and that there was always food in the refrigerator. When the children lived with Father, H.B. slept in her playpen in the living room,[61] A.B. slept in his bed in the living room, and Father slept in the master bedroom. Father said that if the children were returned to him, he would attempt to obtain a part-time job to increase his income and then upgrade to a two-bedroom apartment. He said that he would let the children have the two bedrooms and that he would sleep in the living room.

---

[60]Mother said that Father had dogs that lived inside the apartment.

[61]Father said that he was waiting to buy a bed for H.B. until he was sure he was getting his children back.

70

## W. Father's Finances

Throughout the case, Father has received SSI. He receives a monthly disability check for $692 and a monthly SSI check for $2. If the children were returned to him, he would receive a $46 check for A.B. from his Social Security. Father said that he currently receives $200 in food stamps and that he would receive $360 to $400 per month if the children were returned to him.

Father said that if he had the children, his monthly expenses would include $345 for rent, $61 for electricity, $60 for cell phone service (to keep in contact with his probation officer), $36 to $42 for water, $20 to $30 for diapers and clothing for the children, and $25 for bus transportation.[62] All of the groceries, except his cigarettes, would be bought using food stamps. When asked about other expenses, such as entertainment, Father said that he was trying to save money so that if his children were returned to him, he could buy them the things that they needed.

Father said that the reason he was not currently working was because the CPS case had taken up so much of his time that there was no time to go and get a full-time job. Father said that he can earn $900 per month without losing his SSI and that he is going to work full-time after he completes technical school; he

---

[62]Father stated that he no longer had credit cards but admitted that he had credit card debt that had accrued during his marriage. His monthly budget, however, did not include the amount that he would be paying toward that debt.

71

is going to be a freelance computer technician and expects to make fifteen to twenty dollars an hour, or possibly more.

## X. Character Testimony

### 1. Friend's Testimony

Diana Michelle Gordon testified that she has known Mother and Father since the early years of their marriage. Gordon saw them two or three times per month at their house. Gordon said that H.B. has always been small and that she saw her eating; she did not see anything that concerned her. Gordon said that the children were fed, clothed, and clean and that Mother and Father took very good care of their children.

Gordon said that during Mother and Father's separation, Gordon had contact with Mother about three or four times a month. Mother called Gordon and asked for Father's phone number so that she could talk to him about this case, and Gordon said that she could not give it to her. Gordon called Father and told him about Mother's call.

Gordon said that she knew of about five times when Father watched the children, but he did not keep them while Mother worked; Mother's sister or a friend name Allison watched the children.

### 2. Apartment Complex Manager's Testimony

Dorene Branum, the manager from the Cherry Hill Apartments, testified that she knew Father because he came in to the office "all the time" with his children and visited with the office staff. Branum said that she saw Father with

the children two or three times a week and that the ladies in the apartment complex's office would watch the children while he would run upstairs to put away groceries. Branum said that Father was protective of his children and would not leave them with just anyone. Father was always good with his children; he played with them and talked to them, and they seemed very happy. Branum said that the children looked healthy and taken care of and that she never saw bumps and bruises on them.

Branum said that Father was always pleasant. She did not have any problems with Father; he was very quiet, did not associate with many people at the apartment complex, and was current on his payments.

### 3.     Groomer's Testimony

Mother had provided Groomer with reports of her observations of Father's behavior—including his irritability, anger, instability, temper, and fits—and Groomer also had the opportunity to observe Father's behaviors for herself. Father rarely talked to Groomer in a nice, polite, professional manner. Groomer said that apart from the confrontation in the lobby at the Ben Street CPS location, she had another confrontation with Father, but it was not that extreme. She said that one time earlier in the case, they had "some words" when Father demanded that she do things the way he wanted them done. When asked whether it was fair to say that Father and Groomer did not get along well, Groomer said that she could not meet Father's demands, including his demand that she immediately return his children. Groomer said that she did not have a personal conflict with

73

Father, but she thought that he was a difficult person to deal with. Groomer, however, said that her personal feelings did not affect her professionalism in handling this case.

### Y. Recommendations and Requests

#### 1. Mother's Recommendation

In Mother's opinion, Father would not make a good parent for the children. She said that she would have concerns for the safety of the children if they were returned to Father because of what A.B. has told her and because of the pictures that she saw of A.B.'s ear and cheek; Mother believes that if the children were placed with Father, they would be in danger physically. Mother said that she had signed a relinquishment of her parental rights[63] because she wanted her children to be safe, and she personally could not achieve that. When asked whether the children would have been safe in her care, she said that they would have been safe but that she "wanted to make sure they'll be safe from their father too." Mother agreed that she was trying to tell the court that she did not feel that she could protect her children from Father:

> I feel if I had the kids, they would be safe in my home. I'm not saying they wouldn't. But as far as me solely protecting them away from him so that he cannot reach them or come in contact with them,

---

[63]If Father's parental rights were not terminated, everyone agreed that it would not be in the children's best interest for the trial court to accept Mother's relinquishment. However, Mother did not perfect an appeal. Additionally, Gordon testified that Mother told her that Mother had made a "deal" with CPS concerning her unborn child. The details of any such "deal" were not made part of the record.

no I can't.  I don't believe that I can, so that is why I said that to the court.

Mother ultimately testified that one slap makes a person unfit to be a parent and that a person should lose his parental rights for such a slap.

### 2.    Burdick's Recommendation

Burdick told Father that she would not recommend that his children be returned to him because her concern was for the welfare of the children.  When asked her opinion on whether Father has the skills to raise a four-year-old child and a three-year-old child, Burdick said that she had concerns because Father did not take good care of himself; she saw him only twice when he was clean and did not have an extreme odor.  She was also concerned that he was incapable of living on the amount of money he had, that he would need more money to raise his children, and that he had an unrealistic view of what it was going to take to raise his children.  Further, Burdick said that Father gets focused on something and cannot be distracted, which was a concern since he would be in charge of small children, and Father possessed an inability to be flexible or to change to accommodate small children.

### 3.    Groomer's Recommendation

Groomer testified that the children were neglected when they were in Father's care and that she did not believe that Father could provide a safe, stable environment for his children.  Groomer testified regarding her concerns about returning the children to Father:  (1) she did not see that he had benefitted from

any of the programs, even though he had completed them twice; (2) his behaviors were of extreme concern; (3) Father did not know how to handle the children when they were acting out because he told her, "[Y]ou won't let me spank them"; (4) he had not accepted responsibility for any of his actions; (5) he could go to jail if his probation was revoked; and (6) she was not sure that he could take care of them financially.[64] Additionally, A.B. had nightmares when he first came into care, the children had eating disorders, and there was a lack of bonding shown during the visits. Moreover, the children, who were almost three and four at the time of the trial, were "more vulnerable" than children who are much older.

Thus, Groomer's recommendation to the court was to terminate Father's parental rights because she believed it was in A.B.'s and H.B.'s best interest. Groomer believed that the failure to thrive incident alone was sufficient to terminate Father's parental rights and that a single slap was sufficient to terminate a parent's rights. However, Groomer said that her recommendation to terminate Father's parental rights was based on everything that had happened,

---

[64]Groomer admitted that she had no specific knowledge of Father's income because he would not talk to her about it; Groomer's understanding was that he received SSI payments.

including the CPS history in Missouri,[65] H.B.'s failure to thrive, A.B.'s injury, and Father's failure to show progress after completing his services.

### 4. Ad Litem's Recommendation

The ad litem testified that he had relied on the testimony of several witnesses: Oldham, who had testified that he was very concerned about Father's mental capacity; Conner, who had testified that he did not see any seizures in H.B. but transported her because of the bruises on her; Barker, who had testified that she had concerns about the amount of food in the house, the injuries that she saw on A.B., and A.B.'s explanation that he had fallen; Wright, who had testified that A.B.'s injuries were on two different planes and were not an accident; and Dr. Lazarus, who had testified that H.B. was not gaining weight because she was not being fed. The ad litem recommended that the children not be returned to Father because he did not believe that the children would be safe.

### 5. Father's Requests

Father asked the trial court to give him an opportunity to get back in his children's lives. He said that he would not have any problem with being monitored by another CPS worker if the trial court gave him another chance. Father said that he was still bonding with the children because of his weekly visits and that his children loved him.

---

[65]However, Groomer agreed that she did not "have any knowledge on what the Court did in Missouri," and the record before us does not contain the Missouri CPS records.

77

Father admitted that he had told someone that if his children were returned to him, he would move to Missouri. He clarified that he would only do that if he was given "the green light" by the trial court; otherwise, he would "be glad to stay in Texas."

## Z. Trial Court's Disposition

After hearing the above evidence, the trial court signed a judgment terminating Father's parental rights. The trial court found by clear and convincing evidence that Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; that Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; and that termination of the parent-child relationship with Father was in the children's best interest. Following the termination trial, the trial court held a prove-up hearing and granted Father's petition for divorce. This appeal from the judgment terminating Father's parental rights followed.

## III. CONDUCT AND ENVIRONMENTAL ENDANGERMENT

In his second and third issues, Father argues that there is no evidence or factually insufficient to establish (D) and (E) termination grounds. Specifically,

Father argues that "the cumulative findings by the trial court would hardly justify a modification in a custody suit, much less the termination of [his] parental rights."[66]

## A.    Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.,* 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the Department seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in

---

[66]The trial court made 145 "findings of fact."  They are primarily recitations and summations of testimony presented during trial.  Some of the  findings of fact are inconsistent with other findings of fact; some are favorable to Father, while others are favorable to the Department.  The factual background of our opinion incorporates the trial court's various findings of fact, and we incorporate them in our legal and factual sufficiency analysis.

favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2008); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

The heightened clear-and-convincing burden of proof in termination cases alters the legal sufficiency standard of review that we apply. In reviewing the evidence for legal sufficiency in parental termination cases, we must determine

whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the termination judgment. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. When credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

The heightened clear-and-convincing burden of proof in termination cases also alters the factual sufficiency standard of review that we apply. In reviewing the evidence following a termination judgment for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction

81

or belief about the truth of the allegations that Father violated (D) or (E) and that the termination of his parental rights would be in the best interest of his children. *See C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed such a firm conviction or belief, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. When reversing on factual sufficiency grounds, we detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67.

### B. Law on Endangerment

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), the Department had to prove that Father (1) knowingly (2) placed or allowed his children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Subsection (D) focuses on dangerous conditions or surroundings that endanger the physical or emotional well-being of the children. *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part by* 243 S.W.3d 611 (Tex. 2007). It focuses on the suitability of the children's living conditions. *Id.* Thus,

under (D), it must be the environment itself that causes the children's physical or emotional well-being to be endangered, not the parent's conduct. *Id.*

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Father's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

## C. Evidence Is Legally Sufficient to Support Termination

We first address whether the evidence is legally sufficient to support termination of Father's parental rights pursuant to (D) or (E)—that is, whether Father (1) knowingly placed or knowingly allowed A.B. and H.B. to remain in conditions or surroundings that endangered their physical or emotional well-being

83

or (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). The Department's brief contains a combined legal and factual sufficiency analysis in which it focuses on five acts or omissions by Father that it contends support termination of Father's rights under (D) and (E): the allegations that Father bruised A.B. by slapping him in July 2008; that Father knew that H.B. was failing to thrive in September 2007; that the children witnessed domestic violence; that Father had emotional difficulties; and that Father did not provide a safe environment for his children.[67] We will examine all of the evidence in the record, focusing on these allegations.

After Father and Mother separated, a doctor diagnosed H.B. as failing to thrive. Contradictory evidence exists concerning how frequently H.B. was in Father's care during this time, but viewing the evidence in the light most favorable to the termination judgment, evidence exists that Father cared for H.B. to some extent around the time of the failure-to-thrive diagnosis when H.B.'s growth was so stunted that she was "falling off the growth chart." Thus, evidence exists supporting an inference that Father knew of and contributed to H.B.'s

---

[67]During oral argument, the State focused mostly on Father's slap to A.B., H.B.'s failure to thrive, and the domestic violence allegations.

84

failure to thrive and that consequently Father's conduct, including omissions, created an endangering environment for H.B. by underfeeding her.[68]

A.B. received bruises while in Father's care. CPS and medical personnel at the hospital documented several bruises of varying ages on A.B., including what appeared to be a slap mark on his face and a bruise on both sides of A.B.'s ear. Concerning the bruise to his ear, A.B. told several people that Father had tried to pull his ear off. Viewing this evidence in the light most favorable to the termination judgment, evidence exists that Father slapped A.B.'s face and/or pinched his ear, causing significant bruising. Although medical tests ruled out any additional injuries to A.B. from the slap and/or pinch by Father, a medical expert testified that all injuries to a child's head are potentially severe. Thus, evidence exists that, on at least one occasion, Father inflicted a potentially severe injury to A.B.'s head. Concerning A.B.'s other bruises, medical personnel opined that these other bruises were not consistent with accidental falls because of their locations. This evidence is some evidence that Father's conduct physically endangered A.B.

A.B. reenacted a fight between Mother and Father that involved Father's pushing Mother and Mother's falling. This evidence is some evidence that Father's conduct directed toward Mother created an environment that endangered A.B.'s emotional or physical well-being.

---

[68]The underfeeding is also supported by the children's eating habits that were witnessed by the foster parents.

85

Some evidence exists that CPS caseworkers found that Father failed to maintain a living environment suitable for the children because of clutter, smoke, and odors that filled his apartment. Father resolved the other alleged deficiencies in the physical home that he provided for A.B. and H.B. Likewise, evidence exists in the record of Father's history of mental and emotional instability; Father admitted that he had been diagnosed with bipolar disorder, and he exhibited mood swings and was belligerent toward CPS workers and the police. But no witness testified and no evidence exists that Father's mental and emotional problems caused consequences to A.B. or H.B. We are not aware of any case law, and none has been cited to us, holding that these acts or omissions by Father—clutter and odors in the home and having been diagnosed with mental and emotional problems—constitute endangering the children, absent evidence that these acts or omissions actually did result in some physical or emotional danger to A.B. or H.B. Absent such testimony, this evidence is no evidence in support of termination under (D) or (E).

Viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that some evidence exists that will support a factfinder's firm conviction or belief that Father violated subsection (D) and (E), and we overrule the part of Father's second and third issues challenging the legal sufficiency of the evidence to support the termination of his parental rights to A.B. and H.B. *See In re J.P.,* No. 02-07-00026-CV, 2008 WL 283295, at *11 (Tex.

App.—Fort Worth Feb. 4, 2008, no pet.) (mem. op.) (holding that evidence was legally sufficient to support termination when record revealed some evidence that appellant had history of mental instability, failed to maintain a clean living environment, and did not demonstrate appropriate parenting skills).

### D. Evidence is Factually Insufficient to Support Termination

We next address whether the evidence is factually sufficient to support termination of Father's parental rights pursuant to (D) or (E); that is whether Father (1) knowingly placed or knowingly allowed A.B. and H.B. to remain in conditions or surroundings that endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We review all of the evidence in a neutral light, including the evidence concerning the five allegations set forth above and relied upon by the Department as establishing (D) and (E) grounds for termination—that Father bruised A.B. by slapping him in July 2008, that Father knew that H.B. was failing to thrive in September 2007, that the children witnessed domestic violence, that Father had emotional difficulties, and that Father did not provide a safe home for his children.

### 1. Injuries to A.B.—Factually Insufficient (E) Ground

Medical tests established that A.B. had no underlying injuries beyond his bruising. His bruising injuries included red marks underneath and on one side of his eye, an old bruise on his left eyebrow, red scattered dot-type marks on his left

87

cheek, purple  bruising in and around his left ear, linear marks or a "slap mark" on the left side of his face, and a small bruise on his abdomen and on his buttock.  Concerning the bruise to A.B.'s left ear and the linear marks on the left side of his face, A.B. and Father both said that A.B. had fallen.  Later, A.B. said that Father had "tried to pull his ear off," but A.B. never told anyone that Father had slapped him.  Although medical personnel testified that because the bruises on A.B.'s abdomen and buttocks were not on boney prominences, they were likely not the result of an accidental fall; medical personnel did not rule out other causes of accidental bruising to a three-year-old toddler like A.B. from bumping into things, sitting on things, or from accidents other than falling.  Medical personnel testified that A.B.'s bruises—other bruises to A.B.'s face and ear— were of varying ages, but no one testified whether they were less than or more than a month old.  In other words, whether they occurred before or after Father regained possession of A.B.[69]

Father testified that he had pleaded guilty to injury to A.B. in order to obtain probation so that he could work his service plan, but he was adamant that he did not slap A.B., even going so far as to take a polygraph examination in an attempt to prove his innocence.  Mother testified that in all her years with Father, A.B.'s statement regarding his ear is the only incident that she was aware of in which

---

[69]The Department had returned the children to Father approximately one month before Barker visited them at Father's apartment and reported A.B.'s bruising.

her son complained that Father may have injured him. The record contains no evidence of physical injuries to the children prior to Barker's second visit to Father's apartment one month after he regained possession of the children; likewise, the CPS referral in Missouri was not based on any injuries to A.B. (H.B. had not been born).

Termination under subsection (E) may not ordinarily be based on a single transaction, but rather "a showing of a course of conduct is required." *In re D.P.*, 96 S.W.3d 333, 338 (Tex. App.—Amarillo 2001, no pet.); *see also In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied) ("[A] voluntary, deliberate, and conscious 'course of conduct' by the parent is required."). Conduct similar to Father's may be insufficient even under the preponderance of the evidence standard to modify conservatorship of a child. *See Stucki v. Stucki*, 222 S.W.3d 116, 123–24 (Tex. App.—Tyler 2006, no pet.) (upholding joint managing conservatorship even though father had hit child on the head with a book hard enough to give her a headache); *see also In re B.R.P.*, No. 11-07-00255-CV, 2009 WL 1349954, at *2–3 (Tex. App.—Eastland May 14, 2009, no pet.) (mem. op.) (holding that father's slap that left a red mark on child's face for two days did not cause substantial harm to require change of conservatorship). Thus, viewing all of the evidence in a neutral light, the evidence that Father pinched A.B.'s ear and/or slapped A.B.'s face and that A.B. had other small bruises on his body is factually insufficient to establish a firm conviction or belief

that Father engaged in an endangering course of conduct from June 10, 2008 to July 8, 2008.

### 2. H.B.'s Failure to Thrive—Factually Insufficient (D) or (E) Grounds

The record before us is likewise factually insufficient to establish that Father knew of H.B.'s failure to thrive. Father testified that Mother took H.B. to the doctor for her check-ups. He said that he did not attend H.B.'s doctor visits with Mother that often because she did not allow him to go; no contrary evidence exists in the record. Father testified that he was a small child and eventually took growth hormones and that he believed H.B. was small because she took after him. Mother testified that the doctors thought H.B. was small like Father and that the doctors did not tell Mother to alter H.B.'s feedings.

The paramedic who responded when H.B. suffered seizures testified that H.B. "looked a little underweight for her size" but was not emaciated and that the main reason he took her to the hospital was due to the abrasion on her head from being hit by a toy, not her weight.[70] Medical personnel from the hospital testified that H.B.'s failure to thrive would be less obvious to those who saw H.B. frequently, that it would be difficult for a parent to know of the problem unless he had been told by a doctor, and that the parents should have been told of H.B.'s growth issues at a well-baby exam. Mother testified that she was never told of

---

[70]H.B.'s failure-to-thrive diagnosis occurred when she was taken to the hospital by the paramedic.

90

any growth issues with H.B. before H.B. was taken to the hospital for seizures. Father testified that H.B. ate baby food and "table scraps" and that she drank whole milk. Moreover, Father, Mother,[71] and Gordon testified that after Father and Mother separated, Jennifer W. kept the children from 3:00 p.m. to midnight while Mother worked; Jennifer W. and Hall testified that Father kept the children while Mother worked. Assuming that Jennifer W. and Hall are correct, Father would only have had the children during one meal time. And the record reflects that, according to Ms. Cornelius's affidavit, Mother's apartment was barren of food other than Sprite.

Termination under (D) requires that Father "knowingly" placed or allowed his children to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D). Viewing all of the evidence in the record in a neutral light, the evidence is factually insufficient for a reasonable finder of fact to form a firm conviction or belief that Father *knowingly* allowed H.B. to be underfed. *See, e.g., In re J.R.*, 171 S.W.3d 558, 571 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding evidence legally insufficient to show Mother knowingly allowed children to remain in endangering environment when she moved in with sex offender and record failed to show she knew of conviction for sex offense).

---

[71]As mentioned earlier, H.B.'s medical records conflict with Mother's testimony at trial; the records reflect that Mother told medical personnel that Jennifer W. watched the children while Mother was at work and that Father watched the children "sometimes."

### 3. Domestic Violence—Factually Insufficient (D) Ground

A.B. reenacted a fight between Father and Mother during which Father pushed Mother and Mother fell. No evidence exists, however, that domestic violence between Father and Mother resulted in physical injury to the children, and Mother never testified that she had to seek medical treatment as a result of such domestic violence. In fact, Mother testified that Father was never physically violent to the children and that she trusted Father with the children, despite the domestic violence that had occurred between her and Father, because he had never harmed the children; Mother said that in all her years with Father, A.B.'s statement regarding his ear was the only incident that she is aware of in which her son complained that Father may have injured him. Additionally, Father could not be certain that the children saw Mother punch him in the face at his apartment after the separation because the children were in the bedroom. Moreover, Father divorced Mother, so domestic violence between them will not be a continuing issue. Viewing all of the evidence in the record in a neutral light, factually insufficient evidence exists for a reasonable finder of fact to form a firm conviction or belief that the children had been placed in a dangerous environment because of the domestic violence between Father and Mother. *See In re A.S.*, 261 S.W.3d 76, 84–85 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that evidence was legally and factually insufficient to support termination of mother's parental rights under (D) when, even assuming father's behavior was abusive and had occurred in front of the children, mother had taken

responsive action to protect the children by taking them out of the environment); *see also Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990) (holding in conservatorship case "that a parent is a victim of spousal abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child").

### 4. Father's Mental and Emotional Difficulties—Factually Insufficient (D) or (E) Grounds

While the evidence establishes that Father suffered from bipolar disorder and anger issues, no evidence links these mental and emotional problems to endangering conduct by Father. Father testified that he was aware of his bipolar disorder and of how his moods fluctuated, and the record reveals that he took medication for his bipolar disorder, even though he did not want to, because he wanted his children back. The evidence in the record concerning Father's mental and emotional difficulties is not in this case evidence of (D) or (E) grounds; the Department did not seek termination under section 161.003. *See* Tex. Fam. Code Ann. § 161.003 (Vernon 2008) (authorizing termination of parent-child relationship under certain circumstances based on mental or emotional illness of parent); *see also, generally, In re A.L.M.*, 300 S.W.3d 914, 919–20 (Tex. App.— Texarkana 2009, no pet.).

### 5. Father's Apartment—Factually Insufficient (D) or (E) Grounds

The record reflects that the Department returned the children to Father to live with him at his apartment one month before their involuntary removal. Father

93

complied with the Department's requests concerning his apartment. He used the sheets that the VOA gave him and purchased food to keep on hand even when the children were not living with him. Although Oldham gave his lay opinion that Father's apartment was not suitable for small children because it was messy and cluttered when he viewed it approximately one month before trial, he did not explain how the children would be harmed by the mess or clutter that he noted. Father's apartment was obviously clean enough for the children to be returned to him in June 2008, so the record demonstrates that Father had the capability to provide a clean living space for the children when necessary. *See J.A.J.*, 225 S.W.3d at 625–26 (holding evidence legally insufficient to support termination under (D) when appellant worked to improve her living situation after son was taken into State custody); *J.R.*, 171 S.W.3d at 577 (holding evidence factually insufficient to establish by clear and convincing evidence that (D) or (E) grounds existed based on alleged unsanitary living environment); *accord M.C.*, 917 S.W.2d at 269–70 (upholding termination under prior standard of review based on "extraordinarily unsanitary conditions" when children's home was roach infested; children ate food off of floor and out of garbage; floor and furniture were littered with food, garbage, dirty clothes, and feces; one child had dead cockroaches matted in her hair; infant had dead cockroaches in her bottle; and one summer, mother moved children into house that lacked plumbing or drinking water).

94

### 6. Other Evidence

Father worked two service plans—under the FBSS plan, he attended parenting classes, completed a psychological consultation and a psychiatric evaluation, attended seven sessions of individual counseling, and completed an anger management course; under the CPS plan, he completed individual counseling, parenting classes, an anger management course, and a psychological consultation; had no positive drug tests; and maintained the same residence—all while never missing a visit with his children.

Father contended throughout trial that various caseworkers had a vendetta against him; these contentions are somewhat supported by evidence in the record that one of Father's caseworkers, Groomer, of her own accord, contacted Father's probation officer to make allegations against Father that were not relevant to his children.

Various witnesses urged the trial court to terminate Father's parental rights based on evidence that is not evidence of endangerment under (D) or (E). Burdick urged termination of Father's parental rights, saying she was concerned for the children because Father had an extreme odor and needed more money to raise the children. Groomer urged termination of Father's parental rights because she did not think that Father had benefitted from the services or that Father could provide a safe environment. Groomer also testified on one occasion that the family plan moved from reunification to termination based on Father's conduct *toward her*.

95

Although Father was apparently not congenial in his dealings with caseworkers, had "an extreme odor," was not well off financially, had a cluttered and messy apartment, was persistent to the point of being annoying and somewhat belligerent to caseworkers with his calls and e-mails concerning his children, and did not—in one person's opinion—exhibit "any behavioral changes or improvement in [his] character after completing programs," this evidence is not evidence of endangerment under (D) or (E).

Likewise, evidence exists that the children demonstrated physical and mental improvement while they were in foster care. Their language skills, social skills, and physical health improved. While these facts, as well as the various witnesses' opinions on Father's parenting abilities,[72] are evidence of the best interests of the children, they are not evidence that Father violated subsections (D) or (E).

### 7. A Reasonable Factfinder Could Not Reasonably Have Formed A Firm Conviction or Belief That Father Violated Subsection (D) or (E)

Viewing all of the evidence in a neutral light, the volume of disputed evidence—set forth extensively above—that a reasonable factfinder could not have credited in favor of subsection (D) and (E) findings is so significant that a factfinder could not reasonably have formed a firm conviction or belief of the truth

---

[72] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing the parenting abilities of the individual seeking custody as a factor to be considered in making a best interest determination).

96

of the allegations that Father violated subsections (D) or (E). *See C.H.*, 89 S.W.3d at 28; *H.R.M.*, 209 S.W.3d at 108. Because the evidence viewed in a neutral light cannot produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established under subsections (D) and (E), factually insufficient exists to support termination of Father's parental rights under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.P.*, 2008 WL 283295, at *12 (holding that appellant's mental health issues, her living conditions, and her parenting skills did not rise to the level of endangerment when considered in context with the other evidence in the record). We sustain the part of Father's second and third issues challenging the factual sufficiency of the evidence to support the termination of his parental rights to A.B. and H.B. *See Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397; *M.S.*, 115 S.W.3d at 547; *Holick*, 685 S.W.2d at 20–21; *M.C.T.*, 250 S.W.3d at 167.

## IV. LEGALLY SUFFICIENT EVIDENCE EXISTS SUPPORTING BEST INTEREST FINDING

In his fourth issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that it was in his children's best interest for his parental rights to A.B. and H.B. to be terminated. Because we have concluded that the evidence is factually insufficient to support termination under (D) or (E), we need not address whether there was factually sufficient evidence to support the trial court's best interest finding. *See* Tex. R. App. P. 47.1. However, because we have held that there was legally sufficient evidence

to support the trial court's findings under (D) or (E), and because a holding of legally insufficient evidence to support the trial court's best interest finding would entitle Father to greater relief than what he is afforded under a factual insufficiency holding, we will analyze whether legally sufficient evidence exists to support the trial court's best interest finding.

## A. Standard of Review

There is a strong presumption that keeping children with a parent is in the children's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the children in a safe environment is also presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the children with a safe environment:

> (1) the children's ages and physical and mental vulnerabilities;
>
> (2) the frequency and nature of out-of-home placements;
>
> (3) the magnitude, frequency, and circumstances of the harm to the children;
>
> (4) whether the children has been the victim of repeated harm after the initial report and intervention by the department or other agency;
>
> (5) whether the children are fearful of living in or returning to the child's home;
>
> (6) the results of psychiatric, psychological, or developmental evaluations of the children, the children's parents, other family members, or others who have access to the children's home;

(7) whether there is a history of abusive or assaultive conduct by the children's family or others who have access to the children's home;

(8) whether there is a history of substance abuse by the children's family or others who have access to the children's home;

(9) whether the perpetrator of the harm to the children is identified;

(10) the willingness and ability of the children's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the children's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the children's family demonstrates adequate parenting skills, including providing the children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the children's physical and psychological development;

(C) guidance and supervision consistent with the children's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the children; and

(F) an understanding of the children's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the children.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the children include (A) the desires of the children, (B) the emotional and physical needs of the children now and in the future, (C) the emotional and physical danger to the children now and in the future, (D) the parental abilities of the individuals seeking custody, (E) the programs available to assist these individuals to promote the best interest of the children, (F) the plans for the children by these individuals or by the agency seeking custody, (G) the stability of the home or proposed placement, (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (I) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Evidence Supporting Best Interest Finding

In addition to the facts detailed above, the record contains other facts supporting the factors listed above, with the exception of the children's wishes because they did not testify. The children were three and four at the time of the

trial and were vulnerable, according to Groomer. They had been placed outside Father's home twice. The foster parents reported that after visits with Father, the children had nightmares, and their behavior reverted to being more infant-like. The children also exhibited developmental delays. Father had trouble being flexible and expressed that he did not know how to discipline the children without spanking them. Father's ability to provide nutritious meals for the children was questioned, and Father had no other family in the area to help him raise his children. As mentioned above, evidence exists that the children demonstrated physical and mental improvement while they were in foster care; their language skills, social skills, and physical health improved. Thus, the plan, as stated in the record, was for Greg's family to adopt the children.

Viewing the evidence in the light most favorable to the termination judgment, we hold that the evidence is legally sufficient to support the trial court's best interest finding. *See Horvatich v. Tex. Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601, 604 (Tex. App.—Austin 2002, no pet.) (holding evidence legally sufficient to support best interest finding but factually insufficient to support best interest finding); *see also In re S.G.S.*, 130 S.W.3d 223, 240–41 (Tex. App.—Beaumont 2004, no pet.) (holding evidence legally sufficient to support trial court's best interest finding). We therefore overrule the portion of Father's fourth issue challenging the legal sufficiency of the evidence.

## V. DUE PROCESS RIGHTS WERE NOT VIOLATED BY DENIAL OF EXPERT WITNESS FEES

As mentioned above, in an attempt to prove his innocence regarding slapping A.B., Father took a polygraph exam on March 26, 2009. After making some pre-test statements, the polygraph examiner asked Father whether he had put any bruises on A.B.'s face, whether he had hit A.B. putting a bruise on his face, and whether Father had caused A.B.'s face to hit anything bruising him; Father answered "no" to each of the three questions. The evaluation of the polygraph results failed to reveal criteria indicative of deception to the relevant questions. Father attempted to introduce the polygraph results at trial, and the trial court excluded the polygraph results and any discussion regarding the polygraph exam.[73]

In his first issue, Father argues that the trial court violated his due process rights by denying him access to expert witness fees. Specifically, Father argues

---

[73]We note, however, that the trial court did not require Burdick's final report that was admitted into evidence to be redacted, and it contains the following with regard to the polygraph exam that Father took:

> In March, [Father] spent $500 to have a polygraph exam by Richard Wood. I encouraged [Father] to spend that money more wisely for the betterment of his children. He stated he was going to prove that he did not hit his son. I also told him that the polygraph was inadmissible in court. He has spent time assuring this counselor that he pl[ed] guilty to Injury to a Child because he was told he had no choice. He sees this as another form of victimization by the courts and CPS. His intent is to take the poly[graph] results back to the Judge that gave him probation and prove he did not injure his son [in an attempt to] get the conviction overturned.

that the trial court erred by denying his request for expert witness fees so that he could pay an expert to lay the predicate for introducing polygraph exam results into evidence. Father acknowledges that this court has previously ruled that due process is not denied by the refusal to provide expert witness fees in termination cases, *see J.T.G.*, 121 S.W.3d at 130, and that he has found no Texas case applying the criminal due process right to an expert to parental rights termination cases. Because we also find no case law applying the criminal due process right to parental rights termination cases, we overrule this portion of Father's first issue.

Father also argues in his first issue in his brief and in his oral argument that he should have been allowed broad discretion (i.e., introducing results from the polygraph exam that he took) in challenging the State's caseworkers' biases and prejudices.

Generally, the admission and exclusion of evidence is committed to the sound discretion of the trial court. *See Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

Although Father argues that he should have been able to ask whether the CPS caseworkers considered the polygraph exam in deciding to recommend the

termination of his parental rights, the record reveals that he did not attempt to do this at trial. Instead, he attempted to discuss the results during his testimony, and the trial court excluded the polygraph results and the discussion regarding the polygraph exam. The trial court did not have the opportunity to rule on the specific issue that Father raises here because this issue was not before it. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (stating that the complaint on appeal must be the same as that presented in the trial court). Therefore, on the record before us, we cannot say that the trial court abused its discretion by not allowing Father to cross-examine the CPS caseworkers on whether they considered the polygraph examination results in making their decision to recommend terminating his parental rights because Father never attempted to question the caseworkers on that issue at trial. *See id.* (holding that appellate court cannot reverse based on a complaint not raised in the trial court); *see generally Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990) (holding that the existence and results of polygraph examinations are inadmissible for all purposes on proper objection), *cert. denied*, 501 U.S. 1259 (1991). We overrule the remainder of Father's first issue.

## VI. CONCLUSION

Having determined that the evidence is factually insufficient to support the trial court's findings under family code section 161.001(1)(D) and (E), we reverse the trial court's judgment and remand for a new trial.

 

SUE WALKER
JUSTICE

PANEL:  WALKER and MCCOY, JJ.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED:  July 29, 2010

# Appendix 2



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00209-CV

IN THE INTEREST OF A.B. AND
H.B., CHILDREN

----------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In five points, Appellant D.B. (Father) appeals the trial court's order terminating his parental rights to his children, A.B. and H.B. Because we hold that the evidence supporting the endangerment findings remains insufficient, we reverse the trial court's judgment terminating Father's parental rights and remand this case to the trial court for another new trial.

---

[1]*See* Tex. R. App. P. 47.4.

## I. Procedural and Factual Background

## A. Procedural Background

This is the second time that this matter has been before our court.[2]

As we detailed in our first opinion, A.B. and H.B. were placed with family members in September 2007 after then fifteen-month-old H.B., weighing only fifteen pounds, was admitted to the hospital; she had suffered a seizure. The Texas Department of Family and Protective Services (TDFPS) concluded that she had been physically neglected. The children remained in that voluntary family placement about nine months before TDFPS returned them to Father's care.[3] About a month after reunification, TDFPS removed the children from Father after a doctor opined that A.B. had injuries that were not accidental, and TDFPS placed the children with an unrelated foster family.[4] TDFPS filed its petition for termination the next day. About seven months later, the children were placed with a second foster family, G.H. and J.H.[5]

In June 2009, after a bench trial, Father's parental rights were terminated for the first time. The trial court found by clear and convincing evidence that Father had knowingly placed or knowingly allowed the children to remain in conditions or

---

[2] *See In re A.B.*, No. 2-09-00215-CV, 2010 WL 2977709 (Tex. App.—Fort Worth July 29, 2010, no pet.) (mem. op.).

[3] *See id.* at *4, 7.

[4] *See id.* at *13.

[5] *See id.* at *28.

surroundings that endangered their physical or emotional well-being, that he had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, and that termination of the parent-child relationship with Father was in the children's best interest.[6] S.B.'s (Mother's) rights were also terminated, but she did not appeal that decision.

Father appealed from that judgment and challenged the legal and factual sufficiency of both endangerment findings and of the best interest finding.[7] In July 2010, this court reversed the judgment and remanded the case to the trial court.[8] In doing so, we overruled Father's legal sufficiency challenges, sustained his challenge to the factual sufficiency of the evidence supporting the endangerment findings, and did not reach his challenge to the factual sufficiency of the evidence supporting the best interest finding.[9] No one petitioned for review of our decision.

Father's parental rights were terminated for a second time in June 2011 when a jury made the same endangerment and best interest findings that the trial court had made in the first trial. This appeal followed.

---

[6]*See id.* at *32.

[7]*See id.* at *1.

[8]*See id.* at *44.

[9]*See id.* at *36, 40–42.

3

## B. Factual Background

Because our previous opinion set forth in great detail the evidence from the first trial,[10] this section of our opinion will set forth additional evidence admitted in the second trial—relevant evidence from new exhibits, relevant testimony from new witnesses, and new testimony from repeat witnesses.

### 1. New Exhibits

#### a. Family Assessment Summary

TDFPS offered and the trial court admitted into evidence a family assessment summary completed by the Missouri Department of Social Services (MDSS). This assessment summary pertains to a December 2005 investigation that MDSS had conducted into the living conditions that Mother and Father had provided for A.B. while living in Missouri. This summary indicates that someone had reported that A.B.'s living conditions in the family's home were unsanitary, hazardous, and immediately threatening to A.B. due to a lack of heat and to the presence of dog feces, dirty clothes, and trash everywhere.

The assessment summary confirms this report in part and refutes it in part. Some boxes checked on the summary indicate that the living conditions were hazardous and immediately threatening, that they needed improvement, and that someone reported poor hygiene and dirty clothes. However, other checked boxes indicate that medical and dental needs were being met, that the living conditions

---

[10] *See id.* at *1–32.

4

were clean, orderly, and sanitary, and that there were no observed infestations. The assessment summary further provides that the family was staying with friends until the heat in their own home was restored.

An MDSS representative told Father that he and Mother had made the appropriate provisions to provide for A.B. by staying in trailers that met minimum standards and that they were free to move to Texas. The assessment summary states that services were needed but that the family declined them and moved out of the state. The summary also provides that MDSS had conducted a prior assessment for abrasions and for unsanitary living conditions in June 2005 and had concluded that services were needed.

### b. H.B.'s Medical Records from the Bedford Fire Department

TDFPS offered and the trial court admitted into evidence medical records showing that H.B. had a possible seizure ten minutes prior to someone calling 9-1-1 on September 29, 2007. The sequence chart indicates that H.B. was found awake and alert in Mother's arms, that H.B.'s pupils were equal and reactive, and that wheezes were detected in her upper lobes. The narrative summarizes Mother's statements to EMS, including that A.B. had hit H.B. in the head with a toy four days prior and that H.B.'s gasps for air had prompted Mother to call 9-1-1. The report outlines the responder's medical observations, including an abrasion on H.B.'s forehead, and notes that the hospital staff was told to notify TDFPS for a possible investigation.

### c. Project RAPP Disposition Form

Father offered and the trial court admitted into evidence a Project RAPP Disposition Form, indicating that a psychiatrist, Dr. Robert Mims, evaluated Father in August 2009 at the Project RAPP offices. We take judicial notice of the fact that Project RAPP is a Tarrant County Mental Health Mental Retardation (MHMR) program that seeks to reduce recidivism through psychiatric and psychosocial rehabilitation.[11] The form further indicates that Dr. Mims concluded that Father did not have signs or symptoms of mental illness and did not require services from Project RAPP.

### d. Order Terminating Father's Deferred Adjudication

Father offered and the trial court admitted into evidence an October 2009 order terminating his deferred adjudication community supervision for injury to a child (A.B.). In this order, the trial court presiding over the criminal case notes that Father had satisfactorily completed nine months of the two-year deferred adjudication community supervision period and had satisfactorily fulfilled his terms and conditions of community supervision. The order discharges Father from further community supervision, allows Father to withdraw his plea, and dismisses the criminal case. The order further releases Father "from all penalties and disabilities resulting from the offense or crime of which he has been convicted or [to] which he has pleaded guilty, as provided by law."

---

[11]*See* Tex. R. Evid. 201(b).

6

### e. Order of Deferred Adjudication for Sammie Jo Rains

TDFPS offered and the trial court admitted into evidence the March 2010 order of deferred adjudication for Rains's conviction of bodily injury to an elderly person. Father testified that at the time of trial, he and Rains were living together, and she was expecting a child that might be his.

### f. Images

A.B. and H.B.'s foster parents, intervenors G.H. and J.H., offered and the trial court admitted into evidence two exhibits relating to Father's involvement with adult websites. The first exhibit is a 2010 image of Father's Myspace webpage that encourages viewers to create a member profile on an adult website at a link provided. The other exhibit is an image of Father's "adultspace.com" profile page, which contains nude photographs. The image indicates that Father has not logged in since June 2008.

Additionally, the trial court admitted into evidence several photographs that G.H. and J.H. had taken, including photographs of the children's rooms, of the children dressed up in costumes, and of the children lying or walking in fields of bluebonnets.

### g. Lease Violation and Pest Control Records

The children's attorney ad litem offered and the trial court admitted into evidence notices of Father's lease violations as well as pest control records from Father's apartment. The notices, dated September 2009 and September 2010, report violations for unhealthy and unsanitary living conditions and poor

7

housekeeping. The first comprehensible pest control record, dated September 28, 2010, indicates that Father's apartment was infested with roaches and that a cleanout would be scheduled for the following week. The next record, dated October 5, 2010, indicates that Father did not comply with instructions for cleanout treatment and that the apartment was thoroughly infested with roaches. The next record, dated October 19, 2010, includes an entry that the roaches were "Bad!!" in Father's apartment. The final record, dated November 16, 2010, indicates that Father's apartment had a heavy roach infestation. All four records indicate that at least one other apartment in the complex was being treated on each of those days.

### h. 2011 Psychological Evaluation

TDFPS offered and the trial court admitted into evidence Dr. Parnell Ryan's January 2011 psychological evaluation of Father. According to the report, Dr. Ryan's diagnostic impressions were that Father has bipolar disorder not otherwise specified (NOS) in partial sustained remission, attention-deficit/hyperactivity disorder NOS, adjustment disorder with depressive mood, and chronic motor tic disorder and was abused as a child. The report indicates that Father told Dr. Ryan that he did not take prescription medications, and Father denied that he ever used illegal drugs or alcohol. According to the report, Father had been in foster homes as a child, but at the time of the evaluation, he described his relationship with his mother as "[o]kay" and with his siblings as "good." Father's greatest fear at the time was losing his children to TDFPS, and he regretted cursing at and getting angry with TDFPS personnel.

8

Dr. Ryan states in his report that Father's profile "suggests someone who has difficulty understanding how his problematic behaviors impact others" but that Father denied needing to change anything about himself. Dr. Ryan recommended that Father participate in TDFPS services, attend counseling, and obtain medical evaluations for possible medication management of his attention difficulties.

## 2. New Witnesses

### a. Jennifer Porter

Porter testified that she was a TDFPS investigator for A.B. and H.B.'s case and that she was assigned on October 1, 2007, when H.B. was still in the hospital. She testified that H.B. was discharged from the hospital around October 8, 2007, and that Father was "up there a lot." She testified that Father was cooperative with her.

Porter testified that she attempted the first home visit on October 9, 2007, but that Father was not home. She added that she heard several dogs barking inside, that there was a cat sitting in the window, and that there was a strong odor of animal feces coming from inside the apartment. When Porter spoke to Father the next day, he told her that he had contacted the city pound because he did not have the means or ability without a car to take away the four dogs and four cats that Mother had brought to the apartment. Porter testified that when she visited Father's apartment on October 10, 2007, there was a strong odor of animal feces and animal urine, stains and animal excrement were on the floor, the walls were ripped up, and bugs were visible in the home, including in the refrigerator and the freezer. She testified

9

that she made the finding of "reason to believe" for physical neglect, and she testified that the condition of Father's apartment could be a dangerous environment for young children who crawl on the floor and put things in their mouths. Porter testified that she did not know the condition of the apartment during the time that Father may have been caring for the children and that she did not have pictures of the apartment with her.

Porter also testified that Father told her that after he and Mother separated, he would watch the children at his home from 3:00 p.m. until midnight while Mother worked. Porter further testified that developmental delays could impact a child's well-being for the rest of her life without proper treatment.

### b. Lamorra Cornelius

Cornelius, a TDFPS investigator for the emergency response unit, testified that when she was a TDFPS caseworker, her job was to work with parents to help them get their children back. She testified that when she first met with Father in October 2007, the children had been placed with family members. She testified that when she walked into his apartment that month, she felt fleas biting her legs and noticed a strong odor, stains on the carpet, roaches in the kitchen, and black water and dirty dishes in the dishwasher. However, Cornelius did not take any pictures of these conditions.

Cornelius testified that each time Father would come to visits at the TDFPS office, he would yell and scream at her, make demands, and ask when he was going to get his children back. She said that this behavior occurred in the children's

10

presence and that this concerned her because it was not a wise use of his time with his children. Cornelius testified that although Father was initially noncompliant, he worked on all of his services from November 2007 to February 2008 and that by March 2008, TDFPS made a decision to allow Father to have visits in his home.

Cornelius testified that when she visited Father's apartment on April 2, 2008, it was clean. She said that she did not notice any odors or stains but that she told Father that he needed to keep more food in the house. Cornelius also testified that after a four-hour visit in April, Father returned the children to TDFPS hungry and dirty from being at the park. She testified that he also returned the children hungry after the next four-hour visit and that he got angry with her when she discussed his failure to feed the children. She explained that Father had difficulty obtaining food because the family members with whom the children had been placed had the food stamps and that Father had trouble getting the food stamps transferred back to him. Cornelius testified that Father had food for the children by the next visit because a friend gave him food.

Cornelius testified that when Father returned the children from the next two visits, one overnight visit in May 2008 and one in June 2008, the children did not appear to have been bathed. But Cornelius testified that despite her concerns regarding the children being fed and being returned dirty, the children were placed back with Father on June 10, 2008.

Cornelius testified that she visited Father and the children on June 17, 2008, and that there was a rotten odor in the air and stains, trash, and "[f]ood, just kind of

11

old food," on the floor but no food to eat in the home. When she opened the bedroom door, she found the children lying in bed. They did not respond to her, which she testified was unusual. She testified that she visited again on June 27, 2008, and that the conditions had worsened—more food on the floor, unclean dishes in the sink, and a rotten odor—except that there was some edible food in the home. The next time that she saw the children was when they were taken to the hospital due to A.B.'s injuries on July 8, 2008. She testified that the children were placed in foster care that night and that she believed that Father had placed the children in a dangerous environment.

### c. Dr. Ryan

Dr. Ryan, a licensed psychologist and professional counselor, testified that he conducted two psychological evaluations of Father and one diagnostic consultation, all of which were admitted into evidence in the second trial. The consultation and the first evaluation were also admitted into evidence in the first trial.

Dr. Ryan testified that the global assessment of functioning (GAF) assesses how well a person is doing in life and that a person with a GAF under 50 is usually hospitalized. Dr. Ryan testified that Father's GAF was 75 in 2007, 55 in 2009, and 55 in 2011. He testified that he diagnosed Father with attention deficit hyperactivity disorder NOS, adjustment disorder with depressive mood, bipolar disorder NOS, and chronic motor tick disorder but that he did not see any sign of psychosis or paranoia. Dr. Ryan also testified that Father did not report being on any medication

in 2007, 2009, or 2011 and that a psychiatrist's report in 2009 indicated that a referral for a pharmaceutical patient assistance program was not needed.

Dr. Ryan testified that Father was consistent in how he presented over the years. Dr. Ryan also testified that lacking insight into one's own behavior and how the behavior affects others is a problem in parenting children but that whether it is a dangerous situation—whether it endangers a child's emotional or physical well-being—depends on what the problematic behavior is. Dr. Ryan testified that Father's insight mildly improved by the last evaluation and that Father's problematic issues were the disorders with which Dr. Ryan had previously diagnosed him. Dr. Ryan testified that having bipolar disorder does not prevent someone from being a good parent and that Father did not present as a dangerous person. Dr. Ryan further testified that everyone has problematic behavior and that Father was able to control his behavior when he chose. Dr. Ryan also testified that an inability to control one's own behavior, for example, illegal drug use, coupled with lack of insight could endanger a child.

Dr. Ryan testified that Father denied needing to change anything and denied needing counseling but that Dr. Ryan believed that Father did need counseling because of his separation from his children. Dr. Ryan testified that he did not recommend that Father go to anger management classes. When asked whether Father would likely participate in services offered through TDFPS, Dr. Ryan said, "Possibly."

### d. Dr. Carl Shaw

Dr. Shaw, a physician at the emergency department of Cook Children's Hospital, testified that he examined A.B. on July 8, 2008, and that A.B. had several locations of bruising around his head. Shaw testified that x-rays detected no fractures and that A.B.'s injuries were not life-threatening but that they were not the type of injuries that a toddler would sustain by an accidental fall or successive falls within a short amount of time. Dr. Shaw testified that he wrote in his affidavit that A.B.'s injuries were likely consistent with physical abuse.

Dr. Shaw testified that A.B.'s skeletal survey showed no evidence of prior bone injuries. Dr. Shaw testified that in his affidavit, his answer to the question of whether he felt that the child would be in immediate danger of additional injury or at a substantial risk of harm if released to the parents was "[P]ossibly so." Dr. Shaw testified that he could not tell whether the injuries happened at one time or at different times.

### e. Bryan Knox

TDFPS investigator Knox testified that he began interacting with Father when TDFPS determined that Father and Cornelius had a lot of conflict. He testified that he went to Father's apartment on July 8, 2008, to investigate the possible abuse of A.B. Knox testified that another investigator and the police were also there. But according to Knox, Father refused to let anyone but Knox into the apartment, and Father called the police officers "pigs."

Knox testified that they all went to the hospital; that Father was "[a]ngry, angry, angry"; that Father told an officer to "suck his dick"; and that the children were present and heard Father say that. Knox told the jury that he had never seen a parent treat a police officer that way. He also testified that in domestic violence cases, it is detrimental to the children's well-being to observe the emotional abuse.

Knox further testified that from around April 2008 to June 2008, he had been inside Father's apartments. Knox testified that Cornelius was with him when he visited the first apartment, which was clean—no bugs, no mice, no smell, and nothing endangering to a child. Knox testified that Cornelius was not with him when he visited Father's second apartment, which Knox said was nothing more than messy. Knox said that he did not have a bad working relationship with Father and that he was a referee of sorts between Cornelius and Father.

### f. Val Trammell

Trammell, a TDFPS case aide, testified that she observed visits at the TDFPS office between Father and his children from October 2008 until June 2009 while the children lived with foster parents. She acknowledged that other visitation facilities permitted TDFPS workers to observe visitations through a mirror but that theirs was more intrusive and stressful for those being observed because the observers stood or sat in the doorway and were visible to those being observed.

Trammell testified that at virtually every visit, Father displayed a lot of anger toward TDFPS in front of his children at the beginning of the visit, said things that are not supposed to be said in front of children on a visit, and got loud on occasion.

15

She said that while this was going on, the children would get very quiet, look down, and move to the other side of the room as if they were trying to make themselves invisible. Trammell clarified that Father's anger was primarily directed at TDFPS and was never directed at the children. She said that TDFPS workers had to call the security guard at times but that when Father calmed down and played with the children, things went fairly well, and the children did not appear to be afraid of him. She also testified that Father did not act hostilely toward TDFPS on one occasion when his attorney and the attorney ad litem were present, showing her that Father had the ability to control his anger.

Trammell further testified that she would pick the children up from J.H. and G.H.'s home to take them to the TDFPS office visits, that J.H. and G.H.'s home was beautiful, and that she was surprised by how quickly the children had bonded with them.

### g. Melissa Reagan-Perez

Perez, a Tarrant County community supervision officer, testified that Father was on deferred adjudication community supervision from September 2008 to October 2009, at which point he was successfully discharged and the case was dismissed.

Perez noted that one community supervision condition had required that Father take medication, that Father was not initially compliant in this regard, that Father obtained a psychiatric evaluation in 2009, and that the psychiatrist did not recommend medication after that evaluation. Perez also noted that Father was

angry and agitated during most of his visits with her and that he would repeat a point continuously to make sure that it was heard but did not generally scream or yell. She testified that the community supervision department was only required to have two contacts with Father per month but that it had thirty contacts with him in June 2009. She explained that these contacts were mostly the police department, TDFPS, or other agencies calling the community supervision office and asking it to address the issue of Father contacting them too often.

Perez testified that from July 2009 to October 2009, Father's apartment was generally cluttered and very unclean but that the children were not living there during that time. She explained that fast food wrappers and containers were left out. Perez opined that Father's apartment was not an appropriate place for children to live "primarily because there [wa]s a very strong odor from the litter box." Perez testified that she also detected a litter box odor as well as human body odor and noticed that the apartment was cluttered when she visited Father's apartment in January 2011.

Perez testified that at the time of trial, Rains was on Perez's community supervision caseload for injury to the elderly and that Rains had previous charges of theft as a juvenile and of assault on the elderly. Perez testified that Rains, who was pregnant, moved in with Father in May 2010, moved out in September 2010, and then moved back in with Father in December 2010. Perez added that Rains identified Jeff Jones, who Perez believed lived with Father and Rains, as her boyfriend and identified Father as the father of her child. Perez further testified that

Rains had another child but did not have custody of that child. Because Perez had never seen Rains interact with children, Perez could not opine as to whether A.B. and H.B. would be safe around Rains.

### h. J.H.

J.H. testified about her previous experience with children, which included working in daycares and in preschools. She testified that she and her husband want to adopt A.B. and H.B. She also testified about her daily routine with the children, which includes playing with H.B. in the morning after G.H. takes A.B. to school, getting H.B. ready for pre-K, taking H.B. to pre-K, resting in the afternoon, picking the children up from school, working on homework and having snacks with them, letting them play, having dinner, bathing them every other day, and putting them to bed.

J.H. testified that she told A.B.'s psychologist that A.B. had a tendency to fall down and say that she and G.H. had pushed him. J.H. testified that Father had filed several reports with TDFPS regarding the couple's treatment of the children. She explained that these reports were disruptive because as a result of the reports, the children were interviewed at school, the children cried, and A.B. had temper tantrums. Finally, she testified that she had never called the police regarding Father but that G.H. had.

### i. Elaine Johnson

Johnson, a licensed professional counselor and children's play therapist, testified that she first saw the children in March 2009. She explained that she

evaluated them over a period of time in play therapy. She testified that when his foster parents brought him in, A.B. was tired, and his affect was "rather flat." She described his play as repetitive and purposeless but very cooperative. Johnson testified that H.B. was aloof and did not have a strong connection with anyone except A.B., to whom she was greatly attached, and that Johnson was still working with H.B. on empathy. Johnson testified that H.B. displayed unusual distress regarding potty training.

Johnson also testified that A.B. tried to bite J.H. on one occasion but that this was not unusual for children who have gone through some sort of trauma. She also said that A.B. hit J.H. and G.H. early on but that the trigger was not always known. She further testified that while the children played out fantasies, they sometimes said things out of the ordinary. She explained that A.B. said things about someone stealing children, "I don't want them dead," and "cutting their brains out." Johnson testified that she went a period of time without seeing the children but that in October 2010, A.B. was having trouble transitioning to going to school and that after expending his energy all day, he was sometimes too exhausted to eat when he got home. She testified that at the time of trial, they were working on modifying behavior so that the children will ask the foster parents for help when needed and to stop meltdowns before they occur.

Finally, Johnson testified that she was really impressed with J.H. and G.H., that they had a beautiful relationship with each other and with the children, and that the children call them "[M]ommy" and "[D]addy" and call Father their "other [D]addy."

19

### j. Joanna Letz

TDFPS caseworker Letz testified that she worked with children who had been put into foster care, with the foster parents, and with the birth parents. She explained that she had been the children's caseworker since August 2010 and had been working with Father since October 21, 2010. She testified that in order to consider placing children back with a parent, she must visit the parent's home. She testified that she went to Father's apartment on October 20, 2010, but that he was not there.

Letz testified that the first time that she saw Father was at the courthouse on October 21, 2010. She claimed that she had tried to introduce herself to him there but that he had told her that he could not speak to anyone without his attorney being present. She testified that she saw him next at the TDFPS office, where she met with Father and his attorney about Father's service plan. She said that even though Father had already completed counseling, parenting classes, anger management, and psychological examinations, she offered them again. She testified that Father agreed only to the completion of another psychological examination.

Letz testified that she went to Father's apartment again in January 2011. She stated that a man first opened the door, and then a woman opened the door and told Letz that she was not supposed to be there. Then Father told Letz that she could not come in without his attorney being present. Letz admitted that Father's attorney had indeed told her not to speak with Father without his attorney and that she believed that it was also "[s]upposed to be" TDFPS's policy. She went to Father's

home without contacting his lawyer because she believed that it was her "duty" and her "job."

Letz testified that she had seen J.H. and G.H.'s home many times and that it was inspirational to watch how they parent the children. She testified that the children had been with J.H. and G.H. for just over two years; that they had a loving relationship with the children; and that the children received love, nurturing, kindness, emotional support, security, and structure in J.H. and G.H.'s home.

Letz testified that TDFPS's permanency goal for Father and his children had been reunification in 2008 but that in October 2010, when she tried to visit Father's apartment, it was for Father's rights to be terminated and for the children to be adopted. Letz testified that in her opinion, it was in the children's best interest for Father's parental rights to be terminated.

### k. Sheryl Coaxum

Coaxum, assistant manager of the Cherry Hill Apartments, testified that Father's lease there began on June 9, 2008, and that he paid his rent on time. She testified that Father had lease violations in September and October 2010 for unsanitary living conditions, which were noticed by the pest control company. She testified that Father had requested that pest control treat his apartment but that on September 28, 2010, the pest control company personnel told Father that they would not treat his apartment until he cleaned it, especially the area behind the microwave where pest control found dead roaches. She testified that pest control could not treat Father's apartment on October 5 because Father had not complied

with instructions to clean it and that they visited Father's apartment twice after that. Coaxum also testified that maintenance employees would not fix Father's dishwasher in September 2010 until he cleaned the dirty floors. She testified that she had no record of a complaint or a lease violation for unsanitary living conditions during June and July 2008 while his children were living with him.

Coaxum further testified that Father told her that Rains was his girlfriend, that Rains had been living with him, and that Rains was pregnant with his child.

### I. Betty Williams

Williams, who resided in the Cherry Hill Apartments, the same apartment complex in which Father resided, testified that she had known Father for eleven or twelve months at the time of trial. She testified that Father would come over to her apartment to work on her computer. She described Father's temperament as "laid back" and testified that he would help her do anything that she could not do, that he was very respectful, and that she had never seen him get upset about anything or lose his temper. She testified that he seemed very concerned about his children.

### 3. New Testimony from Repeat Witnesses

#### a. Chris Conner

Conner, a paramedic with the Bedford Fire Department, offered essentially the same testimony that he had offered during the first trial.[12] However, instead of

---

[12] *See A.B.*, 2010 WL 2977709, at *4.

describing H.B. as appearing lethargic,[13] he testified in the second trial that she appeared normal and did not exhibit signs of having had a seizure.

### b. Janice Barker

As an employee of Volunteers of America, Barker taught Father parenting and homemaking skills from January 2008 to March 2008.[14]  In addition to offering the testimony that she had offered during the first trial,[15] Barker testified during the second trial that when she revisited Father in July 2008, Father lived in a different apartment than he had lived in before.  She testified that this apartment was clean, that he had no pets, and that she looked around but did not see any animal feces or roaches or notice an overwhelming odor.

### c. Nurse Donna Wright

In addition to providing the testimony that she had provided during the first trial,[16] Wright testified during the second trial that in July 2008, A.B. had language delays but no other developmental delays.  She testified that there are many reasons that a child can have language delays, including insufficient stimulation, trouble hearing, multiple ear infections, or neurological delays.  She testified that in her opinion, this inability to verbalize can frustrate a child, cause temper tantrums,

---

[13] *See id.*

[14] *See id.* at *8.

[15] *See id.* at *8–9.

[16] *See id.* at *14.

23

and cause behavioral problems that can jeopardize a child's physical or emotional well-being.

Wright next testified about H.B.'s October 2007 failure-to-thrive diagnosis, which she opined was caused by not being offered enough food. In addition to discussing the dates, weights, and percentages that she had addressed in the first trial, she added that H.B. was in the fiftieth percentile in weight on February 20, 2007, that she dropped to between the third and the fifth percentile by April 9, 2007, and to below the third percentile by May 3, 2007. She opined that a parent would notice such a drop but testified that H.B.'s doctors were not ready to make a failure-to-thrive diagnosis as of May 3, 2007, and that she, too, would have needed to run more tests at that time before making such a diagnosis.

Wright testified that H.B.'s physical or emotional health was endangered by her failure to thrive because it caused her to have a seizure. She testified that at the time of H.B.'s evaluation in July 2008, H.B. had language delays that "would have a potentially endangering effect on [her] physical or emotional wellbeing." Wright further testified that H.B. had motor skill developmental delays that could continue over time and affect her ability to get a job, to play sports, and to do physical labor, which Wright opined would also have a tendency to endanger H.B.'s well-being. Wright also testified that H.B.'s medical records noted "some concern about the development of [her] head and cranium." Wright explained that insufficient nutrition can inhibit brain cell growth and endanger a child's physical and emotional well-being and can do so permanently if it is not corrected.

24

### d. Dr. Peter Lazarus

In addition to offering testimony similar to the testimony that he had offered during the first trial,[17] Dr. Lazarus testified during the second trial that he would have needed to do a history and physical exam, some preliminary tests, and a nutritional consult to rule out medical reasons before making a failure-to-thrive diagnosis in May 2007.

He testified that failure to thrive can lead to repeated infections or problems with psychosocial development—which includes "development anywhere from gross motor, fine motor, language skills, or social skills." He also testified that "[i]f those skills and that type of development [were] impeded, [that] would . . . pose a danger to a child's physical and emotional wellbeing" by keeping the child from meeting milestones.

He further testified that problems with head growth, which H.B. experienced when she was diagnosed with failure to thrive, could endanger a child's physical and emotional well-being by leading to retardation. When asked if H.B.'s failure to thrive could have led to retardation if her condition had gone untreated, Dr. Lazarus said that it could have led to development that was below what would be expected of her.

---

[17]*See id.* at *5.

### e. Jennifer

Jennifer, one of the children's initial foster parents, repeated during the second trial the testimony that she had offered during the first trial,[18] except that she did not state this time that H.B. had used profanity when she was two years old.

### f. Constance Burdick

In addition to repeating the testimony that she had offered during the first trial,[19] Burdick, a clinical social worker with Catholic Charities Diocese of Fort Worth, testified during the second trial that a psychologist had diagnosed Father with paranoia. When Father's attorney showed her Dr. Ryan's evaluation, Burdick stated that this evaluation, which she said was the most current evaluation, did not list paranoia as a diagnosis.

Also, Burdick testified that her clinical opinion in 2009 was that Father was "low functioning in insight and impulse control," which could endanger the physical or emotional well-being of one's child. She explained that a parent who was low functioning in insight would have difficulty knowing how to care for an ill child, an injured child, or a child with developmental problems. She also explained that parents with low impulse control would be more inclined to act spontaneously without thinking, to "smack a child," and to set a bad example for their children.

---

[18] *See id.* at *26–28.

[19] *See id.* at *19–20.

### g. G.H.

In addition to repeating the testimony that he had offered during the first trial,[20] G.H. testified during the second trial that A.B. and H.B. were in kindergarten and pre-K, respectively, in an exemplary school district and that A.B. was in Indian Guides, which he enjoyed. He testified that A.B. was considered "special needs" for speech language delays but that they worked with him a lot outside of school and that he was improving. G.H. also testified about the children's daily routine and about the training that he and J.H. had to receive and maintain to be licensed foster parents.

G.H. testified again about Father's online activities but this time added that G.H. had found the profile page of a seventeen-year-old female who claimed to be in a relationship with Father and that some of the photos on her profile page depicted her with drug paraphernalia.

### h. Father

#### *i.* Testimony Regarding Rains

In addition to repeating the same testimony that he had offered during the first trial,[21] Father testified during the second trial that the only other person who lived in his apartment or stayed overnight was Rains because she was due to have a baby in March 2011. He explained that he was unsure who the father was because he

---

[20] *See id.* at *28.

[21] *Id.* at *1–4, 7–10, 16–23, 28–30, 32.

and Rains separated for about one month and that Jones, who spent some time at Father's apartment to protect Rains while Father was gone, could be the father. Father said that Rains was seeking to qualify for Social Security disability benefits but that he was unsure what disability she had.

Father testified that he did not know until after Rains became pregnant that she was on community supervision for injuring her grandmother. He said that he would still consider Rains to be a safe person for his children to be around if her actions toward her grandmother were out of protection for her child rather than out of pure anger toward her grandmother.

### *ii.* Testimony Regarding His Apartment

Father testified that his apartment was probably not as nice as J.H. and G.H.'s home but that it was the nicest apartment that he could afford. Father stated that his children were not living with him when Cornelius came to his apartment with Knox to make her initial reports or when the maintenance workers came to his apartment. He explained that he had not let Letz into his apartment because he and his attorney had agreed that anyone who wanted to see his apartment would have to obtain permission from his attorney to enter the apartment.

Father testified that he had a king-size bed with two twin mattresses underneath it that functioned as box springs and that he also had couches, an entertainment center with a TV and computer on it, and a computer table in the living room. He stated that he did not have a toddler bed or a crib yet but that he

could obtain those. Father testified that he had only one cat and never had more than one animal in the apartment that he began renting in June 2008.

### *iii.* Testimony Regarding Education and Income

Father testified that he had taken a few classes at Tarrant County Community College as recently as spring 2010 in pursuit of one of two computer degrees—information security technology or personal computer support. He testified that his cumulative grade point average in college was a 3.8 and that he planned on returning to classes when the TDFPS case was over.

Father stated that he could not remember what his last job was and that he continued to receive supplemental security income despite a psychiatrist telling him that he showed no signs of having a mental illness. He explained that the Social Security Administration had not done a review of his disability status since that psychiatrist's report. Father testified that his income consisted of his social security, food stamps, and the money that he earned from donating plasma. He said that he was not financially ready to have the children returned but that if the children were returned to him, his food stamps would increase from $360 to $400, which would be plenty of money.

Father testified that during a time period that included March 2010, he had an advertisement on his Myspace website for an adult website, an affiliated network, which he joined on September 28, 2007. He stated that he did whatever he could do to make money and that he got a percentage of the proceeds that the adult website made off his referrals.

### *iv.* Testimony Regarding TDFPS

Father testified that when Mother's family members were given possession of the children after H.B. was released from the hospital, Father only got to see the children one time over a two- or four-month period, and so he had to "bug and bug and bug" TDFPS to get visits at the TDFPS office. Father testified that he felt like he had to be aggressive, argumentative, and demanding toward TDFPS because they would not look at the facts and would not return his phone calls to give him an update or to tell him what to do next.

He testified that when he was permitted to take the children away from the TDFPS office for visits, the bus ride was so long that most of their time together was spent on the bus or at the park. He testified that he fed them during these visits but that he returned them dirty from their time at the park. He testified that he had to send e-mails, make phone calls, and file complaints to get his visits to last over four hours.

Father admitted that when he and the children were at the hospital after A.B. was injured, he was highly upset that TDFPS was investigating him again and that he did not act maturely toward them. Father testified that when he was released from jail after pleading guilty to injury to a child, he tried to contact his former caseworker, Ruth Groomer, about his service plan and had to call her many times, send her e-mails, and go "over her head" to get the service plan started. He testified that he retained an attorney, that his attorney filed a motion to compel, that the

30

service plan was put in place, and that he completed the service plan with the exception of the batterers' intervention class.

Father testified that he had a horrible relationship with Groomer and that he also had to call, e-mail, and go "over her head" repeatedly to set up visits with his children. He testified,

> [W]hen I tried to be calm and collected with them, you know, when I tried to do the right thing and leave a voicemail and wait for a call back, I would never get a call back. It was almost like, it is [Father], forget it; don't call him back. You know, it's like they blew me off every chance they got.
>
> The only way that I could actually get them to respond to me was to call and call and call and e-mail and e-mail, and make complaints.

Father stated that when he went to the TDFPS office for visits, he had words with Groomer because Groomer accused him of being a child abuser, thought he was a horrible person, did not treat him as a parent, and did not respect him. He admitted that he got into arguments with TDFPS personnel at the TDFPS office but that this did not occur each time and did not occur in front of the children.

Father testified that he filed several reports with TDFPS because he had genuine concern for the children's well-being, such as concerns that they were being pushed while they were in J.H. and G.H.'s care.

### *v.* Testimony Regarding H.B.'s Failure to Thrive

Father testified that he was small but not malnourished as a child and that he suffered from seizures as a child. He said that when he and Mother were together, H.B. was eating and doing everything that she was supposed to be doing. Father

31

said that from July 2007 until September 2007, he watched H.B. "a few times a week, but not on a consistent basis" but that when he cared for her, she ate normal table "scraps" like pizza or whatever he was eating along with milk or formula. Medical records admitted at both trials indicate that Mother's sister babysat the children while Mother was at work and that Father watched the children "sometimes" and on some weekends but not consistently.

Father testified that he was unable to get to the hospital to be with H.B. after her seizure until the following Monday because there was no bus transportation for him over the weekend but that he spent "[e]very single day, except for that Saturday and Sunday" at the hospital. He testified that he was not knowledgeable enough during the time that H.B. had her seizure but that he was now familiar with developmental goals and milestones of children. He also testified that in addition to taking the classes that were required by his service plan, he took a class called "Positive [B]rain [D]evelopment" on his own.

## II. Sufficiency Review of Endangerment Evidence

In his first and second points, Father argues that there is no evidence or factually insufficient evidence that he (1) knowingly placed or knowingly allowed A.B. and H.B. to remain in conditions or surroundings that endangered their physical or emotional well-being or (2) engaged in conduct or knowingly placed the children with

persons who engaged in conduct that endangered their physical or emotional well-being.[22]

## A.  Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."[23]  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.[24]  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.[25]

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best

---

[22] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2012).

[23] *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

[24] Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[25] *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

interest of the child.[26]  Both elements must be established; termination may not be

based solely on the best interest of the child as determined by the trier of fact.[27]

Termination decisions must be supported by clear and convincing evidence.[28]

Evidence is clear and convincing if it "will produce in the mind of the trier of fact a

firm belief or conviction as to the truth of the allegations sought to be established."[29]

Due process demands this heightened standard because termination results in

permanent, irrevocable changes for the parent and child.[30]

In evaluating the evidence for legal sufficiency in parental termination cases,

we determine whether the evidence is such that a factfinder could reasonably form a

firm belief or conviction that the grounds for termination were proven.[31]  We review

all the evidence in the light most favorable to the finding and judgment.[32]  We

resolve any disputed facts in favor of the finding if a reasonable factfinder could

---

[26]Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[27]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

[28]Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008).

[29]*Id.* § 101.007 (West 2008).

[30]*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

[31]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

[32]*Id.*

have done so.[33] We disregard all evidence that a reasonable factfinder could have disbelieved.[34] We consider undisputed evidence even if it is contrary to the finding.[35] That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[36]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province.[37] And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[38]

In reviewing the evidence for factual sufficiency, we give due deference to the jury findings and do not supplant the verdict with our own.[39] Here, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) of section 161.001(1).[40] If, in

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.* at 573, 574.

[38] *Id.* at 573.

[39] *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[40] Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[41]

When we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding.[42]

## B. Law on Endangerment

"Endanger" means to expose to loss or injury, to jeopardize.[43] It requires more than a mere threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.[44]

To prove endangerment under subsection (D), TDFPS had to prove that Father (1) knowingly (2) placed or allowed his children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being.[45] Subsection (D) focuses on dangerous conditions or surroundings that endanger the physical or

---

[41] *H.R.M.*, 209 S.W.3d at 108.

[42] *J.F.C.*, 96 S.W.3d at 266–67.

[43] *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

[44] *Boyd*, 727 S.W.2d at 533.

[45] *See* Tex. Fam. Code Ann. § 161.001(1)(D).

emotional well-being of the children.[46]  It focuses on the suitability of the children's living conditions.[47]  Thus, under subsection (D), it must be the environment itself that causes the children's physical or emotional well-being to be endangered, not the parent's conduct.[48]

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of Father's conduct, including acts, omissions, or failures to act.[49]  Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent.[50]  It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury.[51]  The specific danger to the children's well-being may be inferred from parental misconduct standing alone.[52]  To

---

[46] *In re M.C.*, 352 S.W.3d 563, 566 (Tex. App.—Dallas 2011, no pet.).

[47] *Id.*

[48] *Id.*

[49] *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see* Tex. Fam. Code Ann. § 161.001(1)(E).

[50] *M.C.T.*, 250 S.W.3d at 169; *see* Tex. Fam. Code Ann. § 161.001(1)(E).

[51] *Boyd*, 727 S.W.2d at 533; *M.C.T.*, 250 S.W.3d at 168–69.

[52] *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

determine whether termination is necessary, courts may look to parental conduct occurring both before and after a child's birth.[53]

## C. Legal Sufficiency Analysis

As in the first trial, we first address whether the evidence is legally sufficient to support termination of Father's parental rights pursuant to subsection (D) or (E).[54]

Much of the same evidence that we considered to be legally sufficient to terminate Father's parental rights pursuant to subsection (D) and (E) in the first trial was admitted into evidence during the second trial.[55] Specifically, there was evidence that Father cared for H.B. to some extent around the time that she was diagnosed with failure to thrive due to malnourishment.[56] Thus, as it did last time, this evidence supports an inference that Father knew of and contributed to H.B.'s failure to thrive and, consequently, that Father endangered her by underfeeding her and knowingly allowed her to remain in a malnourished condition that endangered her.[57] Accordingly, viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we again hold that some evidence exists that would

---

[53] *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

[54] *See A.B.*, 2010 WL 2977709, at *35.

[55] *See id.*

[56] *See id.*

[57] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *A.B.*, 2010 WL 2977709, at *35–36.

support a factfinder's firm belief or conviction that Father violated subsections (D) and (E), and we overrule those portions of Father's first two points challenging the legal sufficiency of the evidence to support the termination of his parental rights on these two grounds.[58]

## D. Factual Sufficiency Analysis

As we did in the first opinion, we next address whether the evidence is factually sufficient to support termination of Father's parental rights pursuant to subsection (D) or (E).[59] We review all of the evidence, focusing on the evidence concerning the three allegations that TDFPS relies on as establishing subsections (D) and (E) grounds for termination: (1) H.B.'s failure-to-thrive diagnosis, (2) Father's hostile behavior, and (3) the conditions of Father's homes.[60]

### 1. Failure to Thrive

We concluded in our first opinion that the evidence relating to H.B.'s failure-to-thrive diagnosis was factually insufficient to terminate Father's parental rights under subsection (D) or (E) because a reasonable factfinder could not have formed a firm belief or conviction that Father underfed H.B. or knowingly allowed her to be underfed.[61]

---

[58] *See J.P.B.*, 180 S.W.3d at 573; *A.B.*, 2010 WL 2977709, at *36.

[59] *See A.B.*, 2010 WL 2977709, at *36.

[60] *See id.*

[61] *See id.* at *38.

39

### a. Knowledge

Most of the evidence from the first trial relating to Father's knowledge was also offered in the second trial—namely, EMT Chris Conner's testimony that H.B. did not appear to be emaciated and Father's testimony that Mother took H.B. to the doctor for her check-ups without Father, that he thought that H.B. was small because she took after him, and that he did not know that H.B. was failing to thrive.[62] While Wright added in the second trial that a parent would have noticed H.B.'s drop from the fiftieth to below the fifth percentile in weight from February to April 2007, this is not evidence that Father knew that H.B. was failing to thrive. Indeed, the doctors did not even know at that point that H.B. was failing to thrive, and Wright and Dr. Lazarus both testified that they would have needed to conduct more tests before making such a diagnosis in May 2007.

Therefore, no additional evidence was admitted during the second trial to change our determination that the evidence is factually insufficient to support a finding that Father knew that H.B. was failing to thrive.[63]

### b. Conduct

As for Father's conduct, the evidence in the second trial does not show that Father had the children more often after he and Mother separated than the evidence

---

[62] *See id.*

[63] *See* Tex. Fam. Code Ann. § 161.001(1)(D); *C.H.*, 89 S.W.3d at 28–29; *A.B.*, 2010 WL 2977709, at *38.

in the first trial showed.[64]  Just as in the first trial, some evidence in the second trial

shows that Father had the children daily while Mother worked from 3:00 p.m. to

midnight, while other evidence shows that Father had the children only

"sometimes."[65]  And in the first appeal, we concluded that even if Father had the

children daily while Mother worked, the evidence was insufficient to terminate under

subsection (E).[66]  Also, as in the first trial, the evidence in the second trial shows

that when Father took care of H.B., he fed her table "scraps", such as pizza, along

with milk.

Therefore, no additional evidence was introduced during the second trial to

change our determination that the evidence is factually insufficient to show that

Father's conduct after he and Mother separated endangered H.B. by causing or

contributing to her failure to thrive.[67]

TDFPS appears to argue that because Father and Mother did not separate

until July 2007, Father had sufficient contact with H.B. during April and May 2007,

when H.B. was falling off the growth chart, to tie his conduct to her failure to thrive.

Indeed, evidence that Father had regular contact with H.B. and that H.B. was falling

---

[64] *See A.B.*, 2010 WL 2977709, at *38.

[65] *See id.* at *38 & n.71.

[66] *See id.* at *38–39.

[67] *See* Tex. Fam. Code Ann. § 161.001(1)(E); *C.H.*, 89 S.W.3d at 28–29; *A.B.*, 2010 WL 2977709, at *38–39.

off the growth chart during this time period was admitted in both trials.[68] However, there is no evidence in the appellate record of either trial that Mother and Father were not offering H.B. enough food at that time.[69] Instead, the only evidence in this regard is Father's testimony during the second trial that H.B. was eating normally when Mother and Father were together.

While the jury could have reasonably inferred the requisite conduct based on a diagnosis of failure to thrive due to malnutrition in April or May 2007, the jury did not have evidence of such a diagnosis.[70] Instead, the jury in the second trial had testimony from both Wright and Dr. Lazarus that they would have needed to conduct a series of tests before making a failure-to-thrive diagnosis at that time. Therefore, no additional evidence was introduced during the second trial to change our

---

[68] *See A.B.*, 2010 WL 2977709, at *3.

[69] *Cf. In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *8 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.) (noting that the children had been going through the garbage cans looking for food and that the mother admitted that rations tended to run very low toward the end of the month); *In re H.N.H.*, No. 02-11-00141-CV, 2012 WL 117861, at *2 (Tex. App.—Fort Worth Jan. 12, 2012, no pet.) (mem. op.) (stating that the mother endangered her child by failing to wake up in time to feed her child before the child left for school).

[70] *See In re S.H.A.*, 728 S.W.2d 73, 86 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (inferring that parents did not properly feed child, despite little direct evidence as to what foods they fed the child on a daily basis, when evidence included a diagnosis of failure-to-thrive caused by malnutrition).

determination that the evidence is factually insufficient to show that Father's conduct regarding H.B.'s nutrition before he and Mother separated endangered H.B.[71]

The main evidentiary difference between the first and second trials is that Wright and Dr. Lazarus supplemented their testimony during the second trial by addressing the ways in which A.B.'s and H.B.'s physical and emotional well-being had been endangered by their developmental delays. However, because there was no new evidence that these developmental delays were the direct result of Father's conduct,[72] or that Father knowingly placed or allowed his children to remain in conditions that endangered them, Wright's and Dr. Lazarus's testimony in this regard did not support termination under subsection (D) or (E).[73]

Accordingly, viewing all the evidence and affording due deference to the jury findings, we again hold that the evidence relating to H.B.'s failure-to-thrive diagnosis is factually insufficient to terminate Father's parental rights under subsection (D) or (E) because a reasonable factfinder could not have formed a firm belief or conviction that Father underfed H.B. or knowingly allowed her to be underfed.[74]

---

[71]*See* Tex. Fam. Code Ann. § 161.001(1)(E); *C.H.*, 89 S.W.3d at 28–29; *A.B.*, 2010 WL 2977709, at *38–39.

[72]*See M.C.T.*, 250 S.W.3d at 169.

[73]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

[74]*See id.*; *H.R.M.*, 209 S.W.3d at 108.

## 2. Hostile Behavior

In our first opinion, we held that the evidence of A.B.'s injuries was factually insufficient to terminate Father's parental rights under subsection (D) or (E).[75] Therefore, even if Father committed injury to a child—his criminal case was dismissed after he successfully completed deferred adjudication community supervision—TDFPS needed to offer additional evidence in the second trial to show that Father engaged in a continuing course of conduct that endangered his children's well-being.[76]

In the second trial, TDFPS did not show that Father had injured either of his children on another occasion. Indeed, Dr. Shaw, the Cook Children's Hospital emergency department physician who examined A.B. in July 2008, testified that A.B.'s skeletal survey showed no evidence of prior bone injuries and that he could not tell whether A.B.'s injuries happened at one time or at different times.

However, TDFPS argues that the incident involving A.B. is just one of many examples of Father's hostile and violent course of conduct toward others—namely, police officers and TDFPS caseworkers—under subsection (E).[77] TDFPS contends

---

[75] *See A.B.*, 2010 WL 2977709, at *37.

[76] *See M.C.T.*, 250 S.W.3d at 169.

[77] *See* Tex. Fam. Code Ann. § 161.001(1)(E); *M.C.T.*, 250 S.W.3d at 169.

44

that both the children's observation of this behavior and Father's inability to control or understand the effect of his behavior endangered the children's well-being.[78]

### a. Conduct toward Police Officers

The only new evidence admitted in the second trial regarding Father's conduct toward police officers is the testimony of Knox, the TDFPS investigator, that the children were present when Father cursed at the officers at Cook Children's Hospital. However, we could infer this fact when we addressed this issue in the first appeal, based on evidence from the first trial that the children were at the hospital and that Father was extremely loud.[79] Indeed, we noted in our first opinion that Brooks, the TDFPS investigator charged with investigating the July 2008 referral regarding A.B., described Father as "so aggressive and so loud and in your face" that on several occasions "people had to come in and tell him to be quiet or they were going to have him taken out of the hospital."[80] Brooks even testified that this behavior factored into her decision to remove the children that day.[81] Therefore, Knox's testimony about Father's conduct toward police officers was not new evidence to support termination under subsection (E).

---

[78] *See* Tex. Fam. Code Ann. § 161.001(1)(E).

[79] *See A.B.*, 2010 WL 2977709, at *13 & n.31.

[80] *See id.* at *13 n.31.

[81] *See id.* at *13 & n.31.

### b. Conduct toward TDFPS

Father admitted in the second trial that he had a horrible relationship with Groomer and that after trying to go through the proper channels and then having to "bug" TDFPS by repeatedly calling, emailing, and going over Groomer's head, he felt like he had to be aggressive, argumentative, and demanding toward TDFPS for someone to give him an update or tell him what to do next. However, our first opinion addressed evidence of Father's behavior toward TDFPS personnel, evidence that the children witnessed his behavior, and evidence of how the children responded to such behavior.[82] Specifically, we described an instance in April 2009:

> Father came to a visit while he was very agitated, walked straight toward Groomer, started ranting and raving and shaking his finger in her face, waved his arms, and screamed at her. Father said that Groomer and the program director had lied to him about [TDFPS]'s plan for reunification. . . . Groomer said that Father stood over her screaming, would not sit down, and would not calm himself even after she and the security guard had requested that he calm down. The children retreated to a corner because they appeared to be afraid of him. Groomer became fearful for the children to be returned to Father and decided that [TDFPS] should terminate Father's parental rights. Groomer canceled Father's visitation for that day, and [TDFPS] did not give a make-up visit. Groomer testified that in her seven and a half years with [TDFPS], she had never seen anyone as upset as Father was. He was so upset that it made her fearful or anxious.[83]

In the first trial, we decided that such conduct was not evidence of endangerment under subsection (D) or (E).[84] Moreover, we recognized that Father's contention

---

[82] *See id.* at *21.

[83] *Id.*

[84] *See id.* at *40.

46

that various TDFPS workers had a vendetta against him was "somewhat supported by evidence in the record."[85]

The only new evidence in the second trial relevant to Father's conduct toward TDFPS caseworkers is evidence regarding the frequency of his outbursts toward them. Specifically, Trammell, the TDFPS aide who observed visitation, testified that Father would act out on virtually every visit from October 2008 to June 2009. However, it was apparent from the evidence in the first trial that Father acted this way on numerous occasions: Groomer had testified that two TDFPS employees were required to observe Father's visits and that this was appropriate because a guard had intervened in the visits several times due to Father's behavior.[86] Therefore, Trammell's testimony about the frequency of Father's outbursts toward TDFPS employees was not new evidence to support termination under subsection (E).

Because the second trial did not involve new evidence of Father's hostile conduct, evidence of Father's conduct will again be factually insufficient to support termination under subsection (E) absent new evidence that this conduct endangered the well-being of his children.[87]

---

[85] *Id.*

[86] *See id.* at *21.

[87] *See* Tex. Fam. Code Ann. § 161.001(1)(E).

### c. Endangerment

Knox testified in the second trial that the children's observations of Father's interactions with TDFPS endangered the children's well-being because it is detrimental for a child to observe emotional abuse in a domestic violence situation. Indeed, evidence of children's observations of domestic violence can be used to support a finding of endangerment.[88]  However, as Trammell confirmed, Father never directed his hostility toward his children during his TDFPS visits, and there is no evidence that he directed it toward Mother either.  While conduct need not be directed at the child to constitute endangerment,[89] Knox's testimony about the effects of domestic violence is not evidence that Father's behavior toward TDFPS endangered his children's well-being and therefore not evidence in support of termination under subsection (E).[90]

TDFPS contends that Father's expression of his frustration with TDFPS demonstrated low levels of impulse control, which endangered his children.  Indeed, we have held that an inability to control one's anger is some evidence of endangering conduct.[91]  And Burdick, the Catholic Charities social worker who

---

[88] *See, e.g., In re C.J.O.*, 325 S.W.3d 261, 265–66 (Tex. App.—Eastland 2010, pet. denied); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.).

[89] *See J.T.G.*, 121 S.W.3d at 125.

[90] *See A.B.*, 2010 WL 2977709, at *36.

[91] *See In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *40 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.).

evaluated Father, testified that her 2009 report indicates that Father had low functioning levels of impulse control. However, Dr. Ryan, who evaluated Father in 2011, and Trammell both testified that Father was able to control his behavior. And, notably, Dr. Ryan did not even recommend anger management classes in 2011. Therefore, even showing due deference to the jury findings as we must, we cannot conclude based on the record that a reasonable jury could have formed a firm belief or conviction that Father's behavior toward others was evidence of an inability to control his anger that endangered his children under subsection (E).[92]

To the extent that TDFPS claims that Father's low levels of insight endangered his children, we reject this argument as well. Burdick determined in 2009 that Father had low levels of insight, and Dr. Ryan agreed but noted that Father's insight somewhat improved by 2011. Burdick testified that, in general, being low functioning in insight could have an endangering effect on the well-being of one's children. However, Dr. Ryan clarified that whether lack of insight endangers one's children depends on what the problematic behavior is, with illegal drug use being an example of a problematic behavior about which lack of insight could endanger a child. Dr. Ryan's report noted that everyone has problematic behavior, that Father did not use drugs or consume alcohol, and that Father's problematic behaviors were the disorders with which he had been diagnosed.

---

[92] *See C.H.*, 89 S.W.3d at 28–29.

As for Father's bipolar disorder, Dr. Ryan said that this disorder does not prevent someone from being a good parent, that Father's bipolar disorder was in partial sustained remission, and that Father did not present as a dangerous person. Similarly, there is also no evidence that Father's adjustment disorder in any way endangered the children; rather, Dr. Ryan diagnosed Father with this disorder and recommended counseling because of Father's separation from his children. The only medication that Dr. Ryan recommended was medication to treat Father's attention deficit disorder, and there is no evidence that this disorder, his chronic motor tick disorder, or his GAF score endangered his children's well-being. Because Dr. Ryan did not testify that Father's low level of insight exposed his children to injury,[93] and because Burdick merely testified about a threat of metaphysical injury,[94] a reasonable jury could not have formed a firm belief or conviction that Father's problem with understanding how his behavior affected others endangered his children's well-being.[95]

Accordingly, based on our review of the entire record and applying the appropriate standard of review, we hold that the evidence of Father's hostility is factually insufficient to support the termination of his parental rights under subsection (E) because a reasonable factfinder could not have formed a firm belief

---

[93] *See Boyd*, 727 S.W.2d at 533.

[94] *See id.*

[95] *See C.H.*, 89 S.W.3d at 28–29.

or conviction that Father's behavior toward others in front of his children or his low functioning levels of insight and impulse control endangered his children's well-being.[96]

### 3. Condition of Father's Homes

First, TDFPS points to the condition of Father and Mother's Missouri trailer. The scant evidence in the record regarding MDSS's first contact with the family in June 2005 is "6/26/05 Assessment for abrasions, unsanitary living conditions that was concluded Services needed linked initial 30 days." That brief reference does not provide any proof of unsanitary conditions. Further, there is no evidence that MDSS found that A.B. was in the trailer in December 2005 when MDSS found it to be unsanitary, without heat, and immediately threatening to A.B. Instead, as TDFPS recognizes, the evidence shows that Father, Mother, and A.B. were not staying in their trailer at the time but had moved to trailers that met MDSS's minimum standards.

As evidence of endangerment after the family moved to Texas, TDFPS points to Porter's depiction of the condition of Father's first apartment in October 2007. Porter testified that although Father was not home on October 9, 2007, she could smell a strong odor of animal feces coming from inside. Porter testified that the following day, she entered the apartment and smelled an odor of animal feces and urine, observed stains and animal excrement on the floor, saw bugs in areas of the

---

[96] *See* Tex. Fam. Code Ann. § 161.001(1)(E); *H.R.M.*, 209 S.W.3d at 108.

51

home including the refrigerator and the freezer, and noticed that the walls were ripped up.

While Porter testified that such an environment is dangerous to young children who put things in their mouths, Porter said that she did not know what the condition of Father's apartment was when the children were there, and there is no evidence of either child being at Father's apartment during this time period. Indeed, the evidence shows that Father was not even home from Monday, October 3, when the bus was able to take him to the hospital to see H.B., until Monday, October 10, when the bus, which did not operate on the weekend, was able to take him home after H.B.'s Sunday, October 8 release. Instead, the evidence suggests that this situation was much like the one in Missouri—one in which the animals nearly destroyed the home while the family was out of the home for an extended period of time and unable to return.

Furthermore, no evidence suggests that these same animal-related problems pervaded Father's home again. When Porter visited Father on October 10, Father told her that he had already contacted the city pound about his inability to take the animals anywhere without a car. And Father had only one pet, a cat, for which he had a litter box, by the time his children were returned on June 10, 2008, the day that he moved into his second apartment. Indeed, Father testified that he never had more than one animal in his second apartment.

TDFPS also points to Cornelius's testimony that she smelled a strong odor of animal feces in Father's apartment when she visited in October 2007. We note that

52

Cornelius also said that she could feel fleas biting her legs, that she saw roaches, and that she observed stains on the carpet and dirty water and dirty dishes in the dishwasher.  Because no evidence suggests that the children lived in or visited Father's apartment in October 2007, though, neither Porter's nor Cornelius's testimony about the condition of Father's apartment at that time is evidence that the children were exposed to harm.[97]

While TDFPS does not mention this evidence, we note that TDFPS Investigator Cornelius testified in the second trial that during her visits to Father's apartment on June 17 and June 27, 2008, when the children were present, she saw "kind of old food" and trash on the floor.  But like one of the witnesses in the first trial, Cornelius did not explain how the children would be harmed by the mess or clutter that she observed.[98]  For instance, she did not testify that the children, who were in the bedroom with the door shut, were crawling around on the living room floor, had access to the food, were putting dangerously old food in their mouths, or were endangered by trash on the floor.[99]  Therefore, like the witness's testimony in

---

[97] *See Boyd*, 727 S.W.2d at 533.

[98] *See A.B.*, 2010 WL 2977709, at *39.

[99] *Compare M.C.*, 917 S.W.2d at 270 (holding that the evidence of endangerment was legally sufficient when, in part, children ate food off the floor and out of the garbage), *with In re J.R.*, 171 S.W.3d 558, 573 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that the evidence of endangerment was factually insufficient when, in part, the witness did not state what kind of knife she found on the floor, how long the knife had been there, or whether the children had access to it).

the first trial, Cornelius's testimony is not factually sufficient evidence of endangerment under subsection (D) or (E).[100]

TDFPS also points to the condition of Father's second apartment from September 28 to November 16, 2010. During that time period, Father received lease violations for unhealthy and unsanitary living conditions and for poor housekeeping, pest control instructed Father to clean his apartment before they would treat it for a roach infestation, and maintenance workers refused to make repairs in Father's apartment until he cleaned his floors. However, this evidence of the conditions during fall 2010 was not evidence that these conditions existed in Father's apartment when the children lived there in June and July 2008. Indeed, Coaxum testified that she had no record of unsanitary living conditions in Father's apartment during that time period. Because the children did not live in or visit Father's apartment during fall 2010 and had not done so for several months, evidence of the apartment's condition during fall 2010 was not evidence that the children were exposed to harm.[101]

Next, TDFPS points us to the testimony of Perez, who described Father's apartment from July to October 2009 as "generally cluttered" and "very unclean" and opined that Father's apartment was not an appropriate place for children to live "primarily because there [wa]s a very strong odor from the litter box." Also, Perez

---

[100] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *H.R.M.*, 209 S.W.3d at 108; *A.B.*, 2010 WL 2977709, at *39.

[101] *See Boyd*, 727 S.W.2d at 533.

noted that she detected the litter box odor as well as human body odor in January 2011.

We decided in our first opinion that evidence of Father's body odor is not evidence of endangerment under subsection (D) or (E).[102] And we need not decide whether there is a point at which the odor from a litter box becomes grounds for termination because Perez testified that the children did not live with Father at the time that she detected the odor. Therefore, Perez's testimony about the condition of Father's apartment is not evidence that the children were exposed to harm.[103]

Accordingly, applying the appropriate standard of review, we hold that evidence of the condition of Father's homes is factually insufficient to support termination of Father's parental rights under subsection (D) or (E) because a reasonable factfinder could not have formed a firm belief or conviction that the children were present in Father's homes when the unsanitary conditions were reported in 2007, 2009, 2010, and 2011 or that the children were endangered by the conditions that existed when they did live in the home in June and July 2008.[104]

---

[102] *See A.B.*, 2010 WL 2977709, at *40.

[103] *See Boyd*, 727 S.W.2d at 533.

[104] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *H.R.M.*, 209 S.W.3d at 108.

### 4. Other Evidence

#### a. Rains

The evidence shows that Rains, whom Father identified as his girlfriend and roommate, was convicted of committing bodily injury to an elderly person after injuring her grandmother while trying to protect her daughter. Father testified that his children would be safe around Rains, and Perez, the only other person who testified on this particular matter, said that she could not determine whether the children would be safe around Rains because Perez had never seen Rains interact with children. Without evidence that Rains would expose the children to injury, Rains's potential presence in Father's apartment upon the children's return is not evidence of endangerment under subsection (D) or (E).[105]

#### b. Online activities

Just as Father's involvement with adult websites did not factor into our decision in the first case, it does not factor into our decision in this case.[106] While new evidence of Father's online activities was introduced in the second trial, there is no evidence, just as there was not in the first trial, that the children were exposed to harm.[107] Without evidence that the children were exposed to any danger stemming

---

[105] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *Boyd*, 727 S.W.2d at 533.

[106] *See A.B.*, 2010 WL 2977709, at *29–30.

[107] *See id.* at *29.

from Father's online activities,[108] this evidence is not evidence of endangerment under subsection (D) or (E).[109]

### 5. Conclusion

Applying the appropriate standard of review, the volume of disputed evidence—set forth extensively above—that a reasonable factfinder could not have credited in favor of subsection (D) or (E) findings is so significant that a factfinder could not reasonably have formed a firm belief or conviction of the truth of the allegations that Father violated subsection (D) or (E).[110] Therefore, the evidence is factually insufficient to support termination of Father's parental rights under subsection (D) or (E).[111] Accordingly, we sustain the remaining portions of Father's first and second points.

### III. Best Interest

In his third point, Father challenges the legal and factual sufficiency of the evidence to support the jury's finding that it was in his children's best interest to terminate his parental rights. Because we have concluded that the evidence is factually insufficient to support termination under subsection (D) or (E), we need not address whether the evidence to support the jury's best interest finding is factually

---

[108] *See Boyd*, 727 S.W.2d at 533.

[109] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

[110] *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28–29.

[111] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

sufficient.[112] However, because a holding of legally insufficient evidence to support the jury's best interest finding would entitle Father to greater relief than he is afforded under our factual insufficiency holding, we shall address his contention that the evidence is legally insufficient to support the jury's best interest finding.[113]

Much of the same evidence that supported the best interest finding in the first trial was also admitted into evidence during the second trial.[114] Specifically, the evidence shows that the children exhibited developmental delays, especially A.B., who is considered "special needs." Additionally, the evidence questions Father's ability to provide minimally adequate healthcare, nutrition, and a safe physical home environment as well as his ability to understand his children's needs. The evidence also shows that Rains, who may very well live in Father's home upon the children's return, has a history of assaultive conduct. Additionally, the evidence shows that the children demonstrated physical and mental improvement while they were in foster care, that J.H. and G.H. provide the children with a safe, nurturing environment, that the children call J.H. and G.H. "[M]ommy" and "[D]addy," and that J.H. and G.H. would like to adopt the children if Father's parental rights are terminated.

---

[112]*See* Tex. R. App. P. 47.1.

[113]*See A.B.*, 2010 WL 2977709, at *41.

[114]*See* Tex. Fam. Code Ann. § 263.307(b) (West 2008); *A.B.*, 2010 WL 2977709, at *42.

Therefore, viewing the evidence in the light most favorable to the judgment, we hold, as we did in our first opinion, that the evidence is legally sufficient to support the jury's best interest finding.[115]  We overrule Father's third point.

## IV. Intervention

In his fourth point, Father claims that the trial court erred by allowing G.H. and J.H. to intervene in the termination suit because (1) they should not have been able to gain standing after the trial court wrongfully terminated his parental rights and (2) intervention by foster parents violates a parent's due process rights.  As we have previously explained,

> The standard of review for determining whether the trial court improperly denied a motion to strike intervention is abuse of discretion. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.

> In 1995, the Texas Legislature passed new laws specifically implicating the ability of foster parents to be heard in trial court regarding their foster children.  Foster parents now have two avenues to the courthouse.  First, foster parents can bring an original suit affecting the parent child relationship (SAPCR) if the child has lived with the foster parents "for at least [twelve] months ending not more than [ninety] days preceding the date of the filing of the petition."  Tex. Fam. Code Ann. § 102.003(a)(12) (Vernon Supp.20[12]).

> Second, foster parents who have not had possession of the child for at least twelve months ninety days before they file suit may nevertheless intervene in a SAPCR brought by someone with standing if the foster parents can demonstrate that they have had substantial past contact with the child.  *Id.* at § 102.004(b).

---

[115]*See* Tex. Fam. Code Ann. § 263.307(b); *J.P.B.*, 180 S.W.3d at 573; *A.B.*, 2010 WL 2977709, at *42.

The substantial past contact test established by section 102.004(b) for foster parent intervenors was a dramatic change from the traditional intervenor standing requirement. For several years, the Texas Supreme Court case of *Mendez v. Brewer* dominated the jurisprudence of when foster parents could intervene in termination proceedings. In *Mendez*, foster parents planning on adopting the child if parental rights were terminated sought to intervene in a termination suit. The court looked to [former] section 11.03 of the Texas Family Code, which . . . read: "A suit affecting the parent-child relationship may be brought by any person with an interest in the child." Based on this statute, the court in *Mendez* established a "justiciable interest" standard for intervenors. Applying this standard to the foster parents, the *Mendez* court held that their interest was wholly contingent on the outcome of the termination suit—an interest that was too weak to be justiciable.

Since *Mendez*, however, the Texas Legislature has passed section 102.004, which, as discussed above, creates the new, more relaxed substantial past contact test for establishing intervenor standing in a SAPCR. Thus, a party who cannot *file* a SAPCR under the *Mendez* "justiciable interest" standard may nonetheless *intervene* in a suit filed by a qualified party under the statutory "substantial past contact" standard.

Sound policy supports the relaxed standing requirements. There is a significant difference between filing a suit which could disrupt the children's relationship with their parents, and intervening in a pending suit, where the relationship is already disrupted. In the latter case, intervention may enhance the trial court's ability to adjudicate the cause in the best interest of the child.

Other courts have evaluated cases in which foster parents sought to intervene in termination proceedings. In one case, a seventeen-month-old child had lived with the foster parents for fourteen months of her life. The foster parents had decided to adopt the child if the mother's parental rights were terminated. The appellate court held that, under section 102.004, the trial court did not abuse its discretion in allowing the foster parents to intervene in the termination suit because the foster parents had had substantial past contact with the child.

The foster parents in this case had two avenues to be heard by the court—either as petitioners or intervenors. N.L.G. came to the foster parents in April 2005 and continuously remained with them

through the termination hearing in September 2006. Therefore, under section 102.003(a)(12), the foster parents could have brought an original suit affecting the parent-child relationship concerning N.L.G.

The foster parents in this case, however, chose the second method available to them as intervenors in the suit brought by the State. As intervenors, the foster parents had to provide the trial court with grounds for a finding of substantial past contact with N.L.G. At the time of the hearing on Sarah's motion to strike, the child had lived with the foster parents for her entire life, excluding the first seven days following her birth. Furthermore, the foster parents had become emotionally attached to the child and had decided to adopt her if Sarah's parental rights were terminated. The intervenors made the trial court aware of these facts through their motion to intervene and the hearing on that motion.[116]

Father argues that our reversal of the first termination order should somehow cancel out all but three and a half months of the time that that the children have been with G.H. and J.H.; that is, he argues that the trial court should not have considered the eighteen-month period from June 8, 2009, when the first trial began, until December 9, 2010, when G.H. and J.H. intervened, in deciding the standing issue.

We decline to invade the province of the legislature by injecting new requirements into the statute.[117] We also reject Father's arguments portraying this case as a dispute between parents and foster parents and neglecting the policy of

---

[116] *In re N.L.G.*, 238 S.W.3d 828, 829–31 (Tex. App.—Fort Worth 2007, no pet.) (selected citations omitted).

[117] *See Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 162 (Tex. 2011).

acting in the children's best interest.[118]

Finally, Father's argument ignores the trial court's order in the first trial naming TDFPS as the children's permanent management conservator (PMC) and the related findings that "the appointment of either parent as Managing Conservator would not be in the best interest of the children because the appointment would significantly impair [their] physical health or emotional development" and that the appointment of TDFPS would be in the children's best interest. Neither the findings nor the designation of TDFPS as the children's PMC was disturbed by our first opinion.[119] Because TDFPS placed the children in G.H. and J.H.'s care and left them in that foster home after being designated their PMC, there is no taint on the period of more than twenty one-months that G.H. and J.H. fostered the children before intervening in the termination suit. We hold that the trial court did not abuse its discretion by considering all the time the children have been with G.H. and J.H. and allowing the intervention.

As to Father's due process argument, we find our sister court in Tyler's analysis instructive:

> [The parents] contend that [former] Chapters 11 and 15 of the T[exas] F[amily] C[ode] violate the constitutionally protected right to integrity of the family insofar as they allow a party other than the state to seek the termination of the natural parents' parental rights.

---

[118]*See N.L.G.*, 238 S.W.3d at 830.

[119]*See In re J.A.J.*, 243 S.W.3d 611, 612–13 (Tex. 2007).

62

The right to marry, to establish a home and bring up children is a fundamental liberty interest protected by the fourteenth amendment. The natural parents' fundamental liberty interest in the care, custody and management of their child is not lost because they have not been model parents or have lost temporary custody of their child to the state. A compelling governmental interest must exist in order to justify state interference with the parent-child relationship. The appellants maintain that there is no compelling state interest that would allow parties other than the state to seek a termination of parental rights.

The compelling state interest at stake in parental rights termination proceedings is a *parens patriae* interest in preserving and promoting the welfare of the child. It is undoubtedly true that the *parens patriae* interest favors preservation, not severance, of natural familial bonds. Although favoring the preservation of the natural familial bond, it does not mandate such a result where clear and convincing proof shows that this would not be in the best interest of the child. The determination of what is in the child's best interest requires a fact finding by procedures that promote an accurate determination of whether the natural parents can and will provide an adequate and stable home.

When a conflict arises between the individual's protected interest under the fourteenth amendment and the countervailing compelling state interest, the individual is protected by the due process guarantee of the amendment. But in a case, such as this one, in which due process unquestionably applies, the question remains what process is due. Due process is flexible and calls for such procedural protections as the particular situation demands. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard.'" In *Mathews*, the Supreme Court set out three factors which must be considered in identifying the specific dictates of due process.

> First, the private interest that will be affected by official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

63

administrative burdens that the additional or substitute procedural requirement would entail.

In arguing that the state must show a compelling interest to allow suits for termination by persons other than the state, the appellants confuse the nature of the private, protected interest entitled to due process protection with a procedural characteristic of the Texas process. Clearly, there need not be a compelling state interest for each detail of the process due. In our view, the provision for suits for termination by persons "whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so" does nothing to diminish the appellants' due process protection. Many states give standing to persons other than the state to bring termination suits. Foster parents have standing to bring such actions in at least eight other states. Texas courts have long recognized that parental custodial rights come within the protection of the due process clauses of the federal and state constitutions. "In cases of this kind the question of the fairness of the hearing is always present and has been jealously guarded by the courts." The state's right to intervene to protect dependent or neglected children was recognized long before the advent of state supported child welfare agencies. Before the passage of the F[amily] C[ode], under the statutes pertaining to dependent and neglected children, private persons customarily initiated suits to declare a child dependent and neglected. Common sense argues that the fairness and accuracy of the fact-finding process would be served by granting standing to those among the most intimately concerned with the child's welfare.

The appellants were provided counsel and interpreters, a trial of the issues in which the burden of proof borne by their adversaries was by a clear and convincing evidence standard. The foster parents were required to prove not only the best interests of the child, but also the natural parents' misconduct. In this case, the natural parents were extensively helped by TDHS in an attempt to improve their marginal child rearing capabilities. The appellants' due process rights were not violated by the procedure provided by the T[exas] F[amily] C[ode].[120]

Like the birth parents in *Rodarte*, Father had appointed counsel and a jury trial

---

[120] *Rodarte v. Cox*, 828 S.W.2d 65, 79–80 (Tex. App.—Tyler 1991, writ denied) (citations omitted).

in which the appellees had the burden of proving the grounds for termination by clear and convincing evidence. We therefore likewise hold that allowing the foster parents to intervene did not violate Father's rights to due process.

Further, unlike *Rodarte*, Father has been successful on appeal. Our reversal of this second termination order removes the foster parents as joint managing conservators because the trial court did not make independent conservatorship findings in this order.[121] Thus, Father is in exactly the position he was in before the intervention—TDFPS is the PMC of the children and has placed them with G.H. and J.H. Consequently, even if the intervention had violated Father's rights to due process, he can show no harm. We overrule Father's fourth issue.

## V. Impeachment

In his fifth point, Father argues that the trial court erroneously denied him the right to fully cross-examine Burdick by preventing him from impeaching her regarding her bias against him. Specifically, Father argues that the trial court gave the jury a false impression and violated his right to a full cross-examination by redacting from Burdick's report her mention of his polygraph examination and her comment that he wasted his money by obtaining a polygraph examination. But Father agreed to and the trial court granted a motion in limine that prohibited "[a]ny reference to polygraph results or the taking of a polygraph examination." He therefore cannot now complain of the exclusion of the polygraph evidence on

---

[121]*See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008).

appeal.[122]

Accordingly, we overrule Father's fifth point.

## VI. Conclusion

Having determined that the evidence is factually insufficient to terminate Father's parental rights under subsections (D) and (E) of section 161.001(1) of the family code and having overruled his other points, we reverse the trial court's judgment and remand the case to the trial court for a new trial.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

MCCOY, J., dissents without opinion.

DELIVERED:  September 13, 2012

---

[122] *See In re A.S.Z.*, No. 02-07-00259-CV, 2008 WL 3540251, at *2 (Tex. App.—Fort Worth Aug. 14, 2008, no pet.) (mem. op.); *McLendon v. McLendon*, 847 S.W.2d 601, 609 (Tex. App.—Dallas 1992, writ denied) (holding that because father agreed to the omission of specific periods of possession, he cannot complain on appeal that the failure to grant him specific terms is reversible error).

66